THE STANDARD SCALE AND SUPPLY CORPORATION, a corporation incorporated under the laws of the State of Delaware, and H. C. MOLTER, W. W. POTTS, W. H. HAINES, MAX ROSEN-KEIMER, GEORGE WOLF and J. HOWARD SWICK, Defendants Below, Apellants,

*vs.*

R. H. CHAPPEL, D. L. DALY, and JOHN GAMMELL, Complainants Below, Appellees.

*Supreme Court, on Appeal, January 17, 1928.*

332

PENNEWILL, C. J., and RICE, HARRINGTON, RICHARDS, and RODNEY, J. J., sitting.

*Clarence A. Southerland* and *Charles C. Keedy*, for appellants.

*Andrew C. Gray*, of the firm of Ward, Gray & Ward, and *R. T. M. McCready*, of Pittsburgh, Pa., for appellees.

RODNEY, J., delivering the opinion of the Court:

We shall now consider the three questions raised by the appeal.

We think the Chancellor was entirely correct in determining that the ballots mentioned in the statement of facts should be counted as straight ballots for the four persons named therein exclusive of the 45 Williamson shares considered hereafter.

Referring to the sample ballot set out in the statement of facts, we find on the face of it the following:

"I, the undersigned, hereby vote 150 shares of stock for the following named persons to serve as directors for the ensuing year."

The intent of the voter must be gathered from the ballot. Nothing can be clearer to us than the fact that the voter owning 150 shares of stock desired to vote all of said shares for the four persons named in said ballot. It is true that there are certain figures added after each individual name voted for as director and that the sum total of these figures equals seven times the number of votes cast and thus shows a desire that the ballot should have been counted cumulatively. Under the Delaware law, the ballot

could not have been counted cumulatively under any circumstances and it necessarily results that the ballot should be given its full legal effect of carrying out the wish of the voter, viz., the counting for each individual voted for the number of shares voted by each ballot. So far as the present corporation is concerned, the situation as to cumulative voting is precisely the same as if the laws of Delaware did not provide for cumulative voting under any circumstances. In such a case, as in the present, there would be only one legal method of computation of votes and even a clearly expressed desire to vote cumulatively would be nugatory and surplusage but would not destroy the legal effect of the ballot where the ballot clearly expresses the names to be voted for and the number of votes cast. *Re P. B. Mathiason Mfg. Co.*, 122 *Mo. App.* 437, 99 *S. W.* 502; and *Commonwealth v. Blatchford*, 21 *Pa. Dist. R.* 453, cited by the appellants, in no degree differ from this conclusion. The votes considered in those cases could have been cast cumulatively or as straight votes, and the courts correctly held that it would not be proper for a person having cast his ballot in one manner to suggest that he intended to have had the votes counted in the other manner.

The law, as contended for by the appellants, is tersely stated in their reply brief:

"If the ballots do not clearly indicate which one of two or more ways they are cast, it would be improper for the tellers to count them in any particular way upon their own initiative and their duty would be to reject them."

The difficulty in applying this statement to the instant case is that here the ballots could not have been counted cumulatively and there were not two or more ways in which they could be cast, but only one. The tellers rejected the ballots—the Chancellor decreed they should be counted and in this we see no error, reserving for the present the consideration of the 45 Williamson shares.

We now come to the question of the propriety of counting the 45 Williamson shares. The corporate election was held March 7, 1927. The shares were issued to Williamson on February 15, 1927. The statute provides that "* * * no shares shall be voted which shall have been transferred on the books of the

company within twenty days next preceding such election. * * * '' The question to be determined is, were the shares transferred to Williamson within twenty days next preceding the election? No point is made as to any possible distinction between shares issued by the company as an original issue or shares transferred to a person from a prior holder, but the sole question is as to the computation of time. The Chancellor determined that the stock was not issued within the twenty day period mentioned by the statute and based such conclusion upon *Simkin v. Cole*, 2 *W. W. Harr.* (32 *Del.*) 271, 122 *A.* 191. The language of Judge Harrington relied upon by the Chancellor was:

"Either under a rule of court or a statute, in the absence of anything showing a contrary intent, the first day should ordinarily be excluded, but the day on which the act is to be done should be included."

We think this is a correct statement of the law and it is so conceded by the appellants. The cited case involved the time when reasons for a new trial should be filed, under a rule of court requiring such reasons to be filed "within four days next after trial." The trial had been held December 7, 1921, and, that day being excluded, the court held that the reasons for a new trial were required to be filed on or before December 11th.

The question involved in the present case is not so much the manner of the computation of time as in determining the point at which the computation should be begun.

The complainants below, appellees, contend that the time should be computed from February 15th and, that day being excluded, the transfer was not within the twenty day period.

The appellants contend the time should be computed backward from March 7, the time of the corporate election and, that date being excluded, the transfer on February 15 was within the twenty day period.

The Chancellor adopted the first view, and in this we think he erred.

The evident purpose of the statute was to fix a dead line at a stated period before a corporate election for the determination of stockholders entitled to vote. The amendatory *Act of March*

2, 1927 (*Volume* 35, *Laws of Delaware*, 231 and 240), allowing the directors, under certain circumstances, to fix the date of this dead line, is not material in the present case. To us, it is entirely apparent that one day preceding March 7 is March 6, and two days preceding March 7 is March 5. Upon this basis, it is inescapable that twenty days preceding March 7 is February 15, and it seems clear that February 15 is within twenty days next preceding March 7. By the reasoning of *Simkin v. Cole* and of every case which we have seen, it has been held that March 7 would be within twenty days next succeeding February 15. You would exclude February 15 and count March 7. If, then, it be true that March 7 is within twenty days next succeeding February 15, it is irrefutable that February 15 is within twenty days next preceding March 7.

It is unnecessary to comment on all the cases cited by the appellees, but there are three on which chief reliance seems to be placed.

In *Ellwood City Borcughs' Contested Election*, 286 *Pa.* 257, 133 *A.* 379, the statute required nomination papers to be filed "at least twenty days before the day of election." The court excluded the day of filing the papers and included the day of election. This case can have no possible bearing upon the one under consideration. While the act considered by the Pennsylvania court did not provide how the time should be computed, the court held that the provision relating to computation of time in the General Elections Act should be followed. This provision as to General Elections (Act July 9, 1919) provided:

"In determining or reckoning any period of time mentioned in this act, the day upon which the * * * paper [is] filed * * * shall be excluded from, and the day of the election shall be included in, the calculation or reckoning." *Laws Pa.* 1919, *p.* 832.

If the court concluded such act was applicable, the statute itself imposed the method of computation of time. The case of *Becker v. Lafayette County*, 138 *Mo. App.* 247, 119 *S. W.* 985, is not easy to understand, but it does seem, with no citations of authorities and with no detailed statement of its reasoning, to have arrived at a different conclusion than herein reached.

The case of *State ex rel. Jones v. Board*, 93 *Ohio*, 11, 112

*N. E.* 136, is much relied on both in the principal brief, and in the reply brief of the appellees. In reality, the case adopts the same method of computation as in the present case. The statute required:

"That 'nomination papers of candidates shall be filed * * * not less than sixty days previous to the day of election'."

The election was on November 2d. The nomination papers were filed on September 3d. The court said:

"Starting with the 1st day of November, which manifestly is one day 'previous to the day of election,' and thus counting the consecutive days backward, it is readily ascertained that September 3 is the sixtieth day, and is, therefore, 'not less than sixty days previous to the day of election'."

To us it is clear that when the statute says no stock shall be voted which shall have been transferred within twenty days of the election, it means that the day of election is the pivotal day from which the computation is made. There is, we think, an abundant authority to sustain this construction. *Dutcher v. Wright*, 94 *U. S.* 553, 24 *L. Ed.* 130; *Miner, Trustee, v. Goodyear Mfg. Co.*, 62 *Conn.* 410, 26 *A.* 643; *Bernard v. Martel*, 68 *N. H.* 466, 41 *A.* 183.

The 45 shares issued to D. S. Williamson being issued to him within twenty days next preceding the election cannot be counted in the result of such election unless we are estopped from excluding such shares by reason of the fact that Williamson was not a party to the bill filed before the Chancellor.

It is not entirely clear whether the Chancellor's refusal to exclude the Williamson shares because Williamson was not a party to the proceeding was based solely on the attack made by the appellant on the legality of the issuance to Williamson or whether the Chancellor considered that the absence of Williamson as a party prevented the determination of the right of Williamson merely to vote.

The appellants attacked the Williamson shares on the ground that they were illegally issued for an inadequate consideration for the express purpose of gaining the control of the election.

We agree with the Chancellor that the legality of the issuance of the Williamson stock—that, is the right of Williamson to own

or hold such stock as distinguished from the mere right to vote the stock—could not properly be passed upon in a proceeding to review a corporate election to which proceeding Williamson was not a party.

The suggestion, however, that the right of Williamson to vote the 45 shares issued within twenty days of the election cannot be considered, because Williamson is not a party, is a very different question and must now be briefly considered. The *Act cf March* 14, 1923 (33 *Del. Laws, c.* 104) conferred on the Chancellor the undoubted right to determine the validity of the election of corporate directors. This statute was fully considered in *Fleer v. Frank H. Fleer Corporation*, 14 *Del. Ch.* 227, 125 *A.* 411. If it be suggested that the Chancellor's remarks in that case concerning the cited statute were *cbiter dicta*, then we remark that the *dicta* was pregnant with correct legal principles. The Chancellor distinctly held that where the proceeding involved the entire control of the corporation's activities, the grievance alleged was not a grievance accruing to an individual, but one common to the entire corporate body. It was distinctly held, and the statute so provides, that the proceedings to review an election need not be by bill at all, but merely upon the petition of any stockholder. The statute provides how the petition shall be served, and if any doubt existed under the *Act cf* 1923 as to the authority of the Chancellor to determine the right to vote at any stockholders' meeting, such doubt must be dissolved upon consideration of an amendment to such act. On March 2, 1927, the *Act of* 1923 was re-enacted with the sole addition of the following language:

"The Chancellor in any proceeding instituted under this section shall have power to determine the right and power of persons claiming to own stock, to vote at any meeting of the stockholders authorized by or referred to in this section." *Volume* 35, *Laws of Delaware, p.* 243, § 15.

The appellees brought a bill in the present case. They could have attained the same object by merely filing a petition.

The complainants claimed to be elected by virtue of or with the assistance of 45 votes which appear from the corporate records were not entitled to vote. We think the statute gives the Chancellor abundant authority to determine the validity of the votes cast.

The fact that Williamson, by a receipted registered letter, had actual knowledge of the hearing before the Chancellor and of the attack on his right to vote at the stockholders' meeting may not be entitled to much weight, but it is significant that he had precisely the same notice provided by the statute for any individual where the proceeding is begun by petition rather than by bill.

In view of the fact that we have reached a conclusion as to the Williamson shares different from that reached by the Chancellor, it then becomes necessary for us to consider the vote of the 54 shares in the name of Eva May Snodgrass and voted by proxy in the name of W. N. Haines. This question was not passed upon by the Chancellor, it being unnecessary in view of his opinion as to the Williamson shares, since the inclusion of those shares gave to the complainants in the proceeding before him a majority of the votes irrespective of the Snodgrass shares.

The record is not at all satisfactory as to the details of the Snodgrass shares, but we think enough can be culled from it to fairly present the question for determination. There seems to be some controversy as to whether the vote of these shares was accepted by the judges of election at all, or whether it was accepted by the judges and simply omitted from the tabulation of the votes. This question becomes unimportant as we shall view the matter from the standpoint of the legality of the vote of the shares.

Eva May Snodgrass obtained the 54 shares of stock in question by transfer from S. H. Martin between July 13, 1925, and March 2, 1926. The exact date does not appear. S. H. Martin had been an employee of the company. The company had been organized in March of 1923 to continue the business of another company of a somewhat similar name, the assets of the latter company having been sold at a receiver's sale. These assets were bought from the receiver by R. H. Chappel in behalf of former employees of the insolvent company for one dollar and the assumption of $209,000 worth of bonds. Chappel conveyed all the assets bought by him to the new company in consideration of 810 shares of common stock of the par value of $100 each. These shares were not actually issued to Chappel, but as trustee he was credited therewith upon the books of the company. The

corporate minutes are almost entirely silent regarding these 810 shares, but, from the testimony, it appears that Chappel was to hold these shares as trustee for employees and that when an employee would buy one share from the company at the par value of $100, he would receive a bonus of two shares from the 810 shares held by Chappel. It seems to be assumed that Martin's 54 shares were obtained from the shares theretofore held by Chappel, but whether the full 54 shares had been so held, or whether Martin had subscribed for 18 shares from the company and received 36 shares as a bonus from Chappel, does not appear.

The objection to the right of Eva May Snodgrass to vote the 54 shares is based upon the restrictions printed upon the certificate issued to her upon her purchase from Martin. It is assumed by us that Martin's certificate had the same restriction upon it.

These restrictions are:

"This certifies that, subject to the restrictions imposed by the following agreement, which restrictions are applicable to the shares evidenced by this certificate ———— is the owner of ———— shares of the capital stock of the Standard Scale and Supply Corporation, transferable only on the books of the company in person, or by duly authorized attorney upon the surrender of this certificate, properly indorsed, and the performance of the conditions imposed by said agreement.

"This stock is subject to the restrictions on transfer set forth in said agreement which provides that:

"The shares represented by this certificate held by any person who, for any reason, ceases to be an employee of the company and such stock held by any person who voluntarily desires to sell, give or transfer in any manner, the same, and such shares passing by death, will, bankruptcy, receivership, execution, or by operation of law in any manner, into the hands of any other person, shall immediately be offered, in writing, addressed to the secretary of the company, for sale at the same percentage, per share, of the book value at the close of the last preceding fiscal year, as was the percentage of book value per share, paid therefor, at the time of purchase thereof, as evidenced by the purchaser's acknowledgment, on the stock book of the company, of the receipt of this certificate, provided, however, that all such shares offered for sale prior to April 1, 1927, shall be offered to the company at one-third of the same percentage of book value as they had at the time of purchase. Should the company, or any of its stockholders, fail to purchase this stock within sixty days after the stock has been offered for sale in writing to the company addressed to its secretary, such stock shall be released from any

restrictions as to transfer. If any such stock of the company represented by this certificate be transferred or held by any person in any manner, contrary to the aforementioned conditions, then no dividends shall be declared or paid on such stock and such stock shall not be allowed to vote during the period of such default."

The question presented is whether stock can be voted where the certificate representing it contains such restrictive features.

Critical examination of the certificate of incorporation and the by-laws of the company discloses nothing upon which the restrictive terms of the certificate can be based. The minutes of the company have been examined in vain for any entry which would throw any light upon the subject. The only entries upon the minutes having anything to do with the matter show that on July 13 Martin had offered his stock to the company at $50.00 per share. On that date the records show:

"Motion made and seconded that the secretary notify Mr. Martin that his offer is not in accord with the agreement on his stock certificate."

On the same day:

"Motion made and seconded our company purchase Mr. Martin's 54 shares if offered in accordance with the agreement printed on the certificate."

On March 2, 1926, the minutes show:

"The secretary reported regarding the disposition of the stock of S. H. Martin, stating that it had been sold to Eva May Snodgrass,"

—and that a new certificate with a restrictive clause restricting the stock from voting or dividend rights until April 1, 1927, was issued and transferred on the books of the company.

The appellees contend that it was agreed by all parties that this trustee's stock should bear this voting and dividend restriction until April 1, 1927, and that purchasers took it with notice of such restriction and that such purchasers had waived any voting rights they would have had.

At the time the appellant corporation was formed it was provided by *Section* 1927 of the *Revised Code of* 1915 that:

"Every corporation shall have power to create two or more kinds of stock of such classes, with such designations, preferences and voting powers, or restriction or qualification thereof, as shall be stated and expressed in the certificate of incorporation. * * * "

Supplementary to this provision was another (*Section* 1931) which provided:

"Unless otherwise provided in the charter, certificate or by-laws of the corporation, each stockholder * * * shall * * * be entitled to one vote in person or by proxy for each share of the capital stock held by him."

These were the statutory provisions which the appellees claim were waived.

To sustain the right to waive the statutory provisions and allow the corporation to issue stock with unauthorized voting limitations thereon, the appellees cite a number of authorities which were advanced in *Brooks v. State*, 3 *Boyce*, at page 20, 79 *A.* 790, 51 *L. R. A.* (*N. S.*) 1126, *Ann. Cas.* 1915*A*, 1133. It is sufficient to suggest that in the cited case this court declined to adopt the cases then pressed upon it and held:

"A by-law that restricts or alters the voting power of stock of a corporation as established by the law of its charter is of course, void. * * * "

The present case is not nearly so strong as the instances given, for here the corporation fixed the voting power in the common stock and only provided for one kind of common stock.

The by-laws are silent as to any material provision.

No formal action of the directors even authorized the restrictive voting rights on the certificate. All that is relied upon to restrict the voting rights is a nebulous general understanding with no specific mention of the parties to such agreement.

Judge Morris in the District Court of the United States in the recent case of *Hodgman v. Atlantic Refining Co.*, 2 *F.* (2*d*) 893, held:

"The rights conferred by stock ownership in a Delaware corporation are to be determined as a matter of law from the Constitution and the laws of * * * Delaware and the charter of the company. Those rights cannot be increased, diminished, or otherwise altered by a contract between the corporation and the person to whom the shares are issued."

The appellees have cited *Cook on Corporations*, (8*th Ed.*) § 622B, and the *General Investment Company v. Bethlehem Steel Corporation*, 87 *N. J. Eq.* 234, 100 A. 347, as authority for the proposition that the voting limitations may be placed upon a part of an issue of common stock with no statutory or charter,

authority for so doing. We do not so read the authorities. The case just above cited arose upon an amendment to the certificate of incorporation and did not pass upon any supposed authority to issue a restrictive kind of stock in the absence of authority in the certificate of incorporation.

The authority of a Delaware corporation to issue special kinds of stock has been somewhat extended since the incorporation of the present company, but the requirement that there be express authority in the charter of so doing remains the same. *Section* 1927 of the *Revised Code of* 1915 was amended by *Act of March* 2, 1927 (*volume* 35, *Laws of Delaware, p.* 226), as follows:

"Every corporation shall have power to issue two or more * * * kinds of stock * * * with full or limited voting powers or without voting powers and with such designations, preferences and relative, participating, optional or other special rights, or qualifications, limitations or restrictions, thereof, as shall be stated and expressed in the Certificate of Incorporation or in any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by the provisions of the Certificate of Incorporation or of any amendment thereto. * * * No corporation shall create any preferred or special stocks unless the creation of such stock shall be authorized by the Certificate of Incorporation or an amendment thereto."

But, after all, it is somewhat difficult to see what evidence there is of any waiver at all on the part of Mrs. Snodgrass. It is true that there is some testimony in the record which might indicate that Mrs. Snodgrass knew the restrictive features of the certificate. An inspection of the certificate, however, shows that the restriction does not in all cases deny the right to vote. The same shares held by Mrs. Snodgrass had been theretofore held under a similar certificate with similar restrictions and were votable in the hands of Martin, the predecessor of Mrs. Snodgrass, as owner of the shares. Identical certificates (that is, employees' certificates) were held by Daly, Chappel and Gammell, who voted the 671 votes for the complainants below, the vote of which shares has been herein validated. The very shares which D. S. Williamson held, being the 45 shares which have been considered in this opinion, were all issued upon a similar certificate as that held by Mrs. Snodgrass. The certificate does not attempt to deny the holder thereof a right to vote while the

holder of such certificate was an employee. Martin was such employee. The certificate expressly states that if Martin, upon severing his association with the company, offered the stock to the company at a certain figure and that if neither the company nor any of its stockholders purchased the same within sixty days after such offer of sale by the employee, that then the stock would be released from any restriction as to transfer. There is not the slightest suggestion which I have found in the record that Mrs. Snodgrass knew of the deal between Martin and the company, the figure at which he had offered, or should have offered, the stock to the company, or the length of time that had elapsed since such offer.

We are entirely clear from a thorough examination of the whole record that the 810 shares which were credited as trustee stock on the books of the company (of which the Snodgrass shares form a part) were part and parcel of the common stock authorized by the certificate of incorporation. When these shares went to Chappel or were credited to him on the books of the company, they contained no voting restrictions. When these restrictions were added or by what authority does not appear.

It is certain that the certificate of incorporation does not provide for such restrictions; it is equally clear that no by-law of the company attempts to furnish the authority for them and the corporate minutes are entirely silent as to their original scope and purpose.

It is therefore clear that the voting restriction placed upon the stock held by Mrs. Snodgrass was so placed there by no apparent authority and is therefore an unauthorized restriction and the 54 shares held by Eva May Snodgrass must therefore be held to be entitled to vote.

Having determined that the cumulative ballots should be counted in the only way the law would allow, that the 45 shares in the name of D. S. Williamson should not be counted and that the 54 shares in the name of Eva May Snodgrass should be counted, the result is that the following persons received votes as indicated after their names:

H. C. Molter................................................... 660
W. W. Potts................................................... 658

W. N. Haines............................................... 660
W. P. McJunkin............................................. 1286
Max Rosenkeimer........................................... 660
George Wolfe.............................................. 660
J. Howard Swick........................................... 651

These were the seven directors returned as elected by the judges of election, and, the vote credited to each being a majority of the votes cast at the election, it follows that the decree must be reversed, and the matter remanded to the Court of Chancery in and for New Castle County for further proceedings in conformity with this opinion.