## MANAGERS SECURITIES CO. v. MALLERY.
### No. 5151.

Circuit Court of Appeals, Third Circuit.
March 26, 1935.

Hugh M. Morris and Geo. Burton Pearson, Jr., both of Wilmington, Del., for appellant.

Beaumont, Smith & Harris, of Detroit, Mich., and Richards, Layton & Finger, of Wilmington, Del. (Hal H. Smith, of Detroit, Mich., and Aaron Finger and Robert H. Richards, both of Wilmington, Del., of counsel), for appellee.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a decree of the District Court holding that the losses resulting from the sales of the common stock of the General Motors Corporation, hereinafter called General Motors, were chargeable against the Class A surplus account of the appellant company.

In order to stimulate and maintain the zeal and co-operation of the responsible executives of General Motors and to promote its general welfare by enabling them to acquire a substantial interest in its common stock, the Managers Securities Company, hereinafter called defendant, was organized on November 26, 1923. The company was composed of about 70 of the responsible, managing executives of General Motors. The charter authorized the issuance of $28,800,000 in 7 per cent. cumulative preferred stock divided into 288,000 shares of the par value of $100 a share; $4,000,000 in class A stock divided into 40,000 shares of the par value of $100; and $1,000,000 in class B stock, divided into 40,000 shares of the par value of $25 a share. These three classes of stock were issued. Defendant then sold all its class A and class B stock to General Motors for $5,000,000. It then purchased from the General Motors Securities Company 30 per cent. of its issued capital stock for which it gave in payment its 288,000 shares of preferred stock plus $4,-950,000 in cash. The General Motors Securities Company owned 7,500,000 shares of the stock of General Motors. This gave the defendant the equivalent of 2,250,000 shares of General Motors stock, for which it paid in stock and cash $33,750,000.

On November 27, 1923, the day following its organization, the defendant and General Motors entered into the following contract which was commonly called the "5 after 7 contract": "General Motors hereby agrees on or before April 1st in each year, commencing with April 1st, 1924, and ending April 1st, 1931, to pay to the Managers Company 5 per cent. of the net earnings of General Motors for the preceding calendar year after deducting from said net earnings 7 per cent. on the capital employed during said year."

There were other transactions between the appellant and General Motors, but the knowledge of them is not necessary to the disposition of this case.

At the time of the organization of the defendant, plaintiff purchased from General Motors 200 shares of class A and 200 shares of class B stock of the defendant. When these executives purchased their stock, they were required to sign an option providing that if they should leave the employ of General Motors or its subsidiary, through no fault of their own, they would sell their class A stock to General Motors at a price equivalent to its par value plus its proportion of the class A surplus "as shown on the books of the company as of April 30th" in the year in which the repurchase was made. In 1929 the plaintiff left the employ of General Motors, which exercised its option and repurchased his class A stock, and thereafter he had only the 200 shares of class B stock.

From the first the defendant was very successful and made a great deal of money. This continued until the "depression" in the fall of 1929. By the summer of 1926, all the preferred stock had been retired, and 30,-000 shares of the class A stock had been retired by 1928, from the income received from the "5 after 7 contract," leaving only 10,000 of class A stock and 40,000 shares of the class B stock outstanding. The charter of the defendant was then amended by reducing its authorized capital to $2,000,000 consisting of the stock as above stated.

The indebtedness of the defendant company having been paid and the stock outstanding as above indicated, it was decided that it would be to the advantage of the stockholders to invest the income of company in the stock of General Motors rather than pay it directly to the stockholders as and when earned. Consequently the defendant borrowed $25,000,000 from J. P. Morgan & Co., gave its note for that amount, and on March 8, 1928, purchased 168,300 shares of General Motors stock for $25,144,075. Later in that year General Motors increased its capital and gave 2½ shares of new common stock for each share of the old, so that the 168,000 shares was increased to 420,750.

Considerable loss was sustained as a result of the purchase of this stock, and the plaintiff contends that it was purchased solely for the account of the class A stockholders, and that the loss incurred must be borne by them on the dissolution of the defendant.

The determination of this question depends primarily upon the laws of Delaware and the provisions of the charter of the defendant.

Section 3 of the Delaware Corporation Law, chapter 65 of the Revised Code of 1915, § 1917, as amended by 34 Del. Laws, c. 112, § 1, provides that every corporation: "Shall possess and exercise all the powers and privileges contained in this Chapter, and the powers expressly given in its charter or in its certificate under which it was incorporated, so far as the same are necessary or convenient to the attainment of the objects set forth in such charter or certificate of incorporation; and shall be governed by the provisions and be subject to the restrictions and liabilities in this Chapter contained, so far as the same are appropriate to and not inconsistent with such charter or Act under which such corporation was formed." Rev. Code Del. (1915) § 1917, as amended by 34 Del. Laws, c. 112, § 1.

Paragraph 3 of section 5 of the Delaware Corporation Law requires that the certificate of incorporation set forth, "the nature of the business, or objects or purposes proposed to be transacted, promoted or carried on." Section 1919, par. 3, Rev. Code Del. 1915.

Paragraph 4 of section 5 of the act (Rev. Code Del. 1915, § 1919, par. 4, as amended by 29 Del. Laws, c. 113, § 5) provides that if there be more than one class of stock created by the certificate of incorporation, there must be a description of the different classes of stock with the terms on which the respective classes of stock are created, and section 13 (Rev. Code Del. 1915, § 1927, as amended by 29 Del. Laws, c. 113, § 7) empowers every corporation to issue one or more classes of stock "with such designations, preferences and voting powers, or restrictions or qualifications thereof, as shall be stated and expressed in the certificate of incorporation."

Pursuant to the powers thus conferred upon corporations, the defendant set out in its certificate of incorporation the nature of the business to be carried on and the three classes of stock, preferred, class A and class B, to be issued. It was granted power in its charter to purchase, hold, and deal in real and personal property, including shares of the capital stock of other corporations, and to issue the stock described in the certificate. Their rights and preferences are defined as follows:

"The holders of the preferred stock shall be entitled to receive when and as declared from the surplus or net profits of the Company yearly dividends at the rate of seven per cent. (7%) per annum and no more, payable semi-annually on dates to be fixed by the by-laws, which dividends shall run from October 15, 1923.

"The dividends on the preferred stock shall be cumulative and shall be payable before any dividend on the Class A stock or the Class B stock shall be paid or set apart, so that if in any year dividends amounting to seven per cent. (7%) on the preferred stock shall not have been paid thereon the deficiency shall be payable before any dividends shall be paid upon or set apart for the Class A stock or the Class B stock.

"Whenever all cumulative dividends on the preferred stock shall have been paid and a sum sufficient for the payment of the next ensuing semi-annual dividend on the preferred stock shall have been set aside from the surplus or the net profits, the board of directors may declare dividends on the Class A stock and the Class B stock as hereinafter provided, payable then or thereafter out of the remaining surplus or net profits.

"In the event of any liquidation or dissolution or winding up of the company, whether voluntary or otherwise, the holders of the preferred stock shall be entitled to be paid in full both the par amount of their shares and the unpaid dividends accrued thereon before any amount shall be paid to the holders of the Class A and Class B stocks, and after such payment is made the Class A stock shall be preferred as to the par value thereof plus the total undistributed net amount, after providing for taxes, accruing to the credit of the Company under a certain contract between the Company and General Motors Corporation under the terms of which the Company is entitled to receive and the General Motors Corporation is obligated to pay five per cent. (5%) of the net earnings of the General Motors Corporation after deducting seven per cent. (7%) on the capital employed by General Motors Corporation, and after such payment is made the remaining assets shall be paid to the holders of the Class B stock pro rata according to their respective shares."

* * *

"The preferred stock in multiples of ten (10) shares may at any time, at the option of any holder thereof, be exchanged par for par for the seven per cent (7%) collateral trust gold bonds of the Company of the total authorized issue of Twenty-eight million, eight hundred thousand dollars ($28,-800,000.00), dated October 15, 1923, and maturing April 15, 1931, secured by deed of trust executed by this Company unto Wilmington Trust Company of Wilmington, Delaware, as trustee, pledging as security for the payment of said bonds one hundred forty-eight thousand, five hundred nine (148,509) shares of General Motors Securities Company, a corporation organized under the laws of Delaware, and said contract between this Company and General Motors Corporation wherein General Motors Corporation agrees, under the terms and conditions therein set forth, to pay this Company, for the term therein specified, five per cent. (5%) of its net earnings after certain deductions. Said exchange may be effected by surrendering the stock to be exchanged to the Wilmington Trust Company, trustee."

* * *

"There shall be credited to a Class A surplus account, for the benefit of the Class A stock, on the books of the Company, when and as received, the net amount, after providing for taxes, earned by the Company under said contract with the General Motors Corporation wherein General Motors Corporation agrees, under the terms and conditions therein set forth, to pay this Company for the term therein specified, five per cent (5%) of its net earnings after certain deductions. Said Class A surplus may be used for the payment of special dividends on Class A stock, or for the purpose of retiring such Class A stock pro rata either in whole or in part at any time at a price equal to the par value thereof plus its pro rata share of said Class A surplus account. All the remaining net income of the Company shall be credited to a general surplus account.

"All dividends paid, except special dividends on Class A stock as herein provided, shall be paid from the general surplus, and the amount of dividends paid from the general surplus on the Class A and Class B stocks respectively shall be in the proportion that the sum of the Class A capital and Class A surplus and the sum of the Class B capital and Class B surplus respectively bear to each other. * * *"

On July 3, 1929, the fourth paragraph of the certificate was amended to read as follows:

"In the event of any liquidation, dissolution, or winding up of the Company, whether voluntary or otherwise, the holders of the Class A stock shall be entitled to be paid in full both the par amount of their shares plus the total undistributed and accrued net amount of the Class A surplus; and after such payment is made, the remaining assets shall be paid to the holders of the Class B stock pro rata according to their respective shares.

"There shall be credited to a Class A surplus account, for the benefit of the Class A stock, on the books of the Company, when and as received, the net amount, after providing for taxes, earned by the Company under said contract with General Motors Corporation wherein General Motors Corporation agreed, under the terms and conditions therein set forth, to pay this Company, for the term therein specified, five per cent (5%) of its net earnings after certain deductions. There shall also be credited to Class A surplus annually, as of April 30th of each year subsequent to April 30, 1929, interest at the rate of six per cent (6%) per annum on the average daily total of Class A capital stock and surplus during the preceding twelve months, which amount shall be charged to the general surplus account. Said Class A surplus may be used for the payment of dividends on Class A stock, or for the purpose of retiring such Class A stock pro rata either in whole or in part at any time at a price equal to the par value thereof plus its pro rata share of said Class A surplus account. Class A stock retired prior to April 30th of any year subsequent to April 30, 1929, shall be retired at a price which reflects the crediting of interest at six per cent (6%) per annum on the average daily total of Class A stock and surplus from the preceding April 30th to the date of such retirement. All the remaining net income of the Company shall be credited to a general surplus account applicable to the payment of dividends on Class B stock."

Nothing was said here about preferred stock because it had all been retired.

Consequently, when it was determined to dissolve the defendant company and wind up its affairs, this had to be done in accordance with its then existing amended charter which, as above stated, provided that: "In the event of any liquidation, dissolution, or

winding up of the Company, whether voluntary or otherwise, the holders of the Class 'A' stock shall be entitled to be paid in full both the par amount of their shares plus the total undistributed and accrued net amount of the Class 'A' surplus; and after such payment is made, the remaining assets shall be paid to the holders of the Class 'B' stock pro rata according to their respective shares."

This plan of dissolution was carried out. It provided for the payment in full of both the par amount of the shares plus the total undistributed and accrued net amount of the class A surplus, and after such payment, for the payment of the remaining assets of the company to the holders of the class B stock pro rata according to their respective shares. In other words, the "Class A surplus account" measured and fixed the amount and extent of the preference of the class A stock in and to the total surplus of the defendant. The charter determined the credits to be made to that account and the debits to be charged to it. These were fixed and certain. The credits were the net amount, after providing for taxes, earned by defendant under its "5 after 7 contract" with General Motors when and as received, and for each year subsequent to April 30, 1929, interest at the rate of 6 per cent. per annum on the average daily total of class A capital stock and surplus during the preceding twelve months. The debits against that account under the charter could be only payments made for dividends on class A stock and for retiring class A stock.

This construction seems to have been placed upon the provisions of the charter by the defendants and all its stockholders, including the plaintiff, during the entire life of the corporation, until its dissolution was begun, and then the plaintiff alone changed his position and contends that the money paid the defendant by General Motors under the "5 after 7 contract" belonged to class A stockholders and not to the defendant as a corporate entity, that at any rate the defendant held these payments from the "5 after 7 contract" in trust for the class A stockholders.

■ This position is untenable because it is contrary to the literal provisions of the charter and to the fundamental principles of corporation law, for money earned by a corporation does not become the property of its stockholders until it is distributed to them as dividends or in dissolution. Gibbons v. Mahon, 136 U. S. 549, 557, 10 S. Ct. 1057, 34 L. Ed. 525.

It is true that the charter provides that, "there shall be credited to a Class A surplus account, for the benefit of the Class A stock, on the books of the company, when and as received, the net amount after providing for taxes, earned by the company under said contract with General Motors Corporation wherein General Motors Corporation agrees, under the terms and conditions therein set forth, to pay this Company, for the term therein specified five per cent (5%) of its net earnings after certain deductions." While this 5 per cent. under the charter had to be credited to the class A surplus for two specific purposes, until it was distributed in dividends or in retiring stock, it remained an asset of the corporation. If it be conceded that while it remained an asset of the corporation as an entity separate and distinct from the stockholders, it was nevertheless held in trust and could not be used except in the two specified ways for the benefit of the class A stockholders, it does not help plaintiff, for the charter likewise provides the debits which may be charged against the class A surplus, and the losses of the corporation sustained in its purchase of the General Motors stock is not one of the debits which the charter authorizes to be charged against that surplus. The only debits which can be charged against it were payments for dividends on class A stock and payments for retiring class A stock.

But assuming, for the sake of argument, that the defendant as a corporate entity without authority of the charter and against its literal provisions spent the contract money in the purchase of General Motors stock instead of crediting it to the class A surplus, for the benefit of the class A stock, yet it cannot now, against the provisions of the charter, make a charge against that surplus, for the violation of the charter in one respect does not justify its violation in another. The charter required that the net amount received from the 5 per cent. of the net earnings of the General Motors contract be credited to the class A surplus. The purchase of the stock of that company with these earnings, if such was the case, was not a compliance with that requirement, was harmful to the class A, and helpful to the class B, stockholders. Consequently whatever losses the defendant sustained in its venture of purchasing the 168,300 shares of stock cannot be charged against the class A surplus in violation of the provisions of the charter.

The plaintiff says that he does not challenge the principle of defendant's plan of dissolution, but questions the method of calculation by which the amount of assets to be distributed to him as a class B stockholder is determined; that the earnings from the "5 after 7 contract" had to be credited to the class A stock surplus and could be used only for the class A stock in dividends or for its retirement, and the question here is how the property of the defendant corporation shall be distributed on dissolution; and that we are not concerned with the corporation and its creditors, but with the respective rights of the class A and class B stockholders.

The transactions were large and numerous and the accounts long and complicated, but the question at issue is simple: Shall the losses incurred through the purchase of 168,300 shares of General Motors common stock be charged to the stock A surplus or to the general surplus? In the determination of this question, the provisions of the charter are controlling and must guide us.

Plaintiff says that the class A stockholders gave up their right to the earnings of the defendant under the General Motors contract for 1928 until the loan of $25,000,-000 was paid by the agreement made at the meeting in Detroit on February 7, 1928. In other words, he contends that the action taken at that meeting so annulled or changed the provisions of the charter theretofore existing that the stock A surplus, which previously could "be used only for the Class A stock in dividends or for its retirement," could thereafter be legitimately used to purchase the common stock of General Motors.

If this is not true, and it is not, for no such authority could be given the defendant at that meeting, then it improperly used the earnings to purchase that stock, and the class A stockholders, as such, may not be held liable for the defendant's illegal acts which directly injured them more than it did any one else.

The evidence, we think, shows that the meeting at Detroit was not a stockholders' meeting, for the reason, among others, that the by-laws require that all stockholders' meetings be held in Delaware and as a fact all stockholders' meetings have been held at Wilmington, Del. Directors' meetings were permitted to be held outside of the state. At the meeting in Detroit no minutes of the meeting were kept; there was no regular order of business, no reading of minutes, no waiver of notice and no proxies, and the expense of those attending was paid by General Motors. The resolution of the board authorizing the borrowing of the money to pay for the stock refers to the action of the "directors" authorizing the purchase as "informal." There was evidence that there was no discussion as to whether or not General Motors stock should be purchased by defendant. The meeting had none of the indicia of a stockholders' meeting. All the facts indicate that it was not. It was a kind of informal get-together, annual meeting of the major executives of General Motors and some of the directors and stockholders of the defendant to "discuss the progress made during the previous year" and what they hoped for during the current year and for the future.

Plaintiff, however, says that it was a valid corporate meeting; that it and similar meetings were the only meetings at which the stockholders actually gathered to discuss the affairs of the corporation.

This is not quite correct. It may be that this and similar meetings were the only ones at which its stockholders largely and personally came together to discuss the progress of the company in the past and their hopes for the future, but the stockholders "actually" came together at the regular and stated stockholders' meetings annually in Wilmington and their rights were exercised by them personally or by proxy. If their rights as stockholders were exercised by them in person or by proxy and resulted in corporate action, they were "actually," but not personally, present.

But plaintiff still further says that the regularity or validity of that meeting is unimportant, the important thing being the acceptance by the class A stockholders of the proposal for the diversion of their income; that all the class A stockholders ratified the action of the meeting by making no objection to the application of their income to the purchase of the stock, by making no protest when they failed to receive their dividends until the stock was paid for, and by approving at the annual meeting in Wilmington on June 28, 1928, all the acts of the officers and directors, among which was the purchase of the stock. Perkins v. Trinity Realty Co., 69 N. J. Eq. 723, 61 A. 167; Lincoln Court Realty Co. v. Kentucky Title Savings Bank & Trust Co., 169 Ky. 840, 185 S. W. 156.

There was no statement or hint at the meeting in Detroit that the stock was to be purchased for the class A stockholders and not for the corporation as such. Neither

was there any discussion as to how the $25,-000,000 was to be paid. The earnings from the General Motors contract was only a part, and the smaller part, of defendant's earnings. There was no discussion at that meeting to the effect that it was to be paid for from the contract earnings. Since the income from the contract had been used for the purchase of stock in 1923 for the defendant as a corporate entity and also to retire the preferred stock, it is not illogical to assume that it was purchased by the corporation and for the corporation as an entity. There was no hint that this stock was to be held differently from its other stock. It was purchased and set up on the books in the corporation's name, held as its general asset, and never allocated to either class of stock. The corporation borrowed the money in its own name and pledged its own credit for the repayment.

But assuming that there was an unexpressed intention on the part of some or all of the class A stockholders that the stock should be allocated to them, and that this was a diversion of the class A surplus, the plaintiff took part in it and was to that extent responsible for this act which was not simply ultra vires, but an actual violation of the charter, for neither the action at the meeting in Detroit on February 7, 1928, nor the alleged ratification thereof can be regarded as an amendment to the charter which defines the rights of the stockholders on dissolution. If it is true, as plaintiff alleges, that "earnings (of the 5 after 7 contract) were credited to 'A' surplus account, and by specific charter provisions that surplus could be used only for the Class 'A' stock in dividends or for its retirement," he who had, contrary to the charter, consented to the diversion of that surplus, and profited thereby, cannot now in dissolution proceedings, and for his own advantage, again set aside the provisions of the charter which specifically and expressly declare the rights to which the class A stockholders and he, as a class B stockholder, are entitled on the dissolution of the company. Standard Scale & Supply Corp. v. Chappel et al., 16 Del. Ch. 331, 141 A. 191; Gaskill v. Gladys Belle Oil Co., 16 Del. Ch. 289, 146 A. 337.

Consequently, the holders of the class A stock on the dissolution are entitled to be paid in full the par value of their shares plus the total undistributed and accrued net amount of the class A surplus. The loss sustained in the purchase of the 168,300 shares of General Motors stock should not be borne in the dissolution by the class A stockholders, but by the defendant, and the loss should come out of the general surplus.

The decree is reversed, with directions to the District Court to enter a decree dismissing the plaintiff's bill.