JAMES S. ABERCROMBIE, PHILLIPS PETROLEUM COMPANY, a corporation, and SUNRAY OIL CORPORATION, a corporation,
Appellants,

'vs.

RALPH K. DAVIES, SIGNAL OIL AND GAS COMPANY, a corporation, THE HANCOCK OIL COMPANY, a corporation, THE GLOBE OIL AND REFINING COMPANY, a corporation, LARIO OIL AND GAS COMPANY, a corporation, ASHLAND OIL AND REFINING COMPANY, a corporation, DEEP ROCK OIL CORPORATION, a corporation, SAMUEL B. MOSHER, GARTH L. YOUNG, JOHN W. HANCOCK, J. HOWARD MARSHALL, HAROLD A. BLACK, FRANCIS L. JEHLE, REXFORD S. BLAZER, SANDFORD M. BURNHAM, AMERICAN INDEPENDENT OIL COMPANY, a corporation and SECURITY FIRST NATIONAL BANK OF LOS ANGELES, CALIFORNIA, a corporation,
Appellees.

RALPH K. DAVIES, SIGNAL OIL AND GAS COMPANY, a corporation, THE HANCOCK OIL COMPANY, a corporation, THE GLOBE OIL AND REFINING COMPANY, a corporation, LARIO OIL AND GAS COMPANY, a corporation, SAMUEL B. MOSHER, GARTH L. YOUNG, JOHN W. HANCOCK, HAROLD A. BLACK, FRANCIS L. JEHLE, JR., and J. HOWARD MARSHALL,
Appellants,

vs.

JAMES S. ABERCROMBIE, PHILLIPS PETROLEUM CORPORATION, a corporation and SUNRAY OIL CORPORATION, a corporation,
Appellees.

*Supreme Court on Appeal, March 19, 1957.*

*John J. Morris, Jr.,* Wilmington (Joseph W. Moore, Houston, Tex., of counsel), for appellant and cross-appellee James S. Abercrombie.

*Robert H. Richards, Jr.,* and *Stephen E. Hamilton, Jr.,* Wilmington, for appellants and cross-appellees Phillips Petroleum Co. and Sunray Oil Corp.

*Richard F. Corroon* and *David F. Anderson* of Berl, Potter & Anderson, Wilmington, and *Francis M. Shea* of Shea, Greenman, Gardner & McConnaughey, Washington, D. C., for appellees and cross-appellants Ralph K. Davies, Signal Oil and Gas Co., The Hancock Oil Co., The Globe Oil and Refining Co., Lario Oil and Gas Co., Samuel B. Mosher, Garth L. Young, John W. Hancock, Harold A. Black, Francis L. Jehle, Jr., and J. Howard Marshall.

SOUTHERLAND, C. J., and LAYTON and HERRMANN, JJ., sitting.

SOUTHERLAND, Chief Justice: The pertinent facts are as follows:

American Independent Oil Company ("American") is a Delaware corporation. It was formed to develop an oil concession in the Kuwait-Saudi Arabian neutral zone. The organizers were James S. Abercrombie, Sunray Oil Corporation ("Sunray"), Phillips Petroleum Company ("Phillips"), Ralph K. Davies, Signal Oil and Gas Company ("Signal"), The Hancock Oil Company ("Hancock"), The Globe Oil and Refining Company ("Globe"), Lario Oil and Gas Company ("Lario"), Ashland Oil & Refining Company ("Ashland"), Deep Rock Oil Corporation ("Deep Rock"), and Allied Oil Company (later acquired by Ashland). The organizers subscribed in varying proportions to American's original issue of stock. Additional stock was later issued, and there are now outstanding 150,000 shares.

The organization agreement provided that the Board of Directors of American should consist of one director for each 5,000 shares held, and that the directors should be elected by cumulative voting. In effect, each stockholder has been permitted to name the director or directors to represent on the board his or its interests. Davies represents his own interest and is president of the corporation. At all times the number of directors has been fifteen. No one stockholder holds a majority of stock, and no one stockholder is represented by more than four directors. Obviously, smooth functioning of such a board was dependent either upon substantial harmony among the interests represented on it or upon an effective coalition of the interests of a majority.

On March 30, 1950, six of the stockholders took steps to form such a coalition. On that date an agreement was executed between eight individuals designated "Agents", and the six stockholders—Davies, Ashland, Globe, Lario, Hancock and Signal. These stockholders hold about 54½% of the shares. They are represented on the board by eight of the fifteen directors. The Agents named in the agreement were at the time the eight directors representing these six stockholders.

The obvious purpose of the agreement was to achieve effective control of the board and thus control of corporate policy. The motive for the agreement, according to the defendants, was to prevent acquisition of control by Phillips, which was the largest single stockholder, holding about one-third of the stock. In the view we take of the case, only the purpose is material.

The Agents' Agreement is an unusual one. In effect, it transfers voting control of the stock of the six stockholders to the eight Agents for a period of ten years (subject to termination by seven of the Agents). The Agents are to be, as far as possible identical with the directors. The agreement of seven of the eight is required to vote the stock and elaborate provisions are added for the choice of an arbitrator to resolve disagreements. Somewhat similar provisions attempt to control the action of the directors. A more detailed examination of the agreement will later be made. At the moment we note that the majority of the board secured by this agreement (eight of the fifteen) comprised Davies, the two Signal directors, the two Hancock directors, the director representing Globe and Lario, and the two Ashland directors.

The effective control thus sought to be achieved apparently lasted until December 9, 1954. On that date a meeting of the Board of Directors was held in Chicago. A resolution was adopted calling a special meeting of the board for December 16, to consider and take action upon certain amendments to the by-laws and other matters. This resolution was adopted by a vote of nine to six. This majority consisted of Abercrombie, the four Phillips directors, the Sunray director, the Deep Rock director, and the two Ashland directors. The minority consisted of Davies and the Globe, Lario, Hancock and Signal directors. The nature of the action to be considered at the proposed meeting was such as to indicate to the minority that the control of the board set up by the Agents' Agreement was seriously threatened. The Ashland directors, it was charged, had violated the Agents' Agreement. Counter moves were made by Davies. Litigation was instituted in California by Davies, Signal, Hancock, Globe and Lario against Ashland and its two directors. American, named as a defendant, was preliminarily enjoined from recognizing any action

taken at a board meeting of December 16, and Ashland was enjoined from violating the Agents' Agreement.

In the meantime, the suit below was filed by Abercrombie, Phillips and Sunray against the other shareholders and the Agents. Davies, Signal, Hancock, Lario, Globe and six of the Agents appeared and answered. Plaintiffs filed a motion for summary judgment. Several contentions arose out of the hearings on this motion. The Chancellor made the following rulings of law:

(1) Certain provisions of the Agents' Agreement attempting to control directorate action are invalid on their face;

(2) The agreement is not a voting trust;

(3) The provisions respecting stockholder action are severable from the illegal provisions, and constitute a valid stockholders' pooling agreement.

See 123 *A.2d* 893, 900 and 903.

Both sides appeal. All of the issues argued below have been presented here.

We turn to an analysis of the Agents' Agreement.

Paragraph 1 provides in part:

"Upon the signing of this Agreement, or as soon thereafter as it may be possible for them to do so, by those whose certificates may be pledged or deposited, as hereinafter referred to, the Shareholders will deliver to the Agents the certificate or certificates representing all the shares of American Independent Oil Company now owned or controlled by them, said certificates to be endorsed in blank or attached to a stock power endorsed in blank. Said Agents will give to each depositing Shareholder a proper receipt for all certificates so delivered."

The certificates and stock powers are to be deposited in escrow in a bank or trust company, subject to withdrawal at any time by any seven of the agents.

Paragraph 2 sets forth a method of dealing with a possible increase in the number of Agents "(or in case a Voting Trust shall have been created, the number of Trustees)".

Paragraph 3 provides in part:

"During the term of this Agreement the Agents or their successors shall have the sole and exclusive voting power of the stock subject to this Agreement. The Shareholders shall deliver to the Agents and shall keep in effect during the life of this Agreement proxies giving said Agents or their successors jointly and each of them severally, with full power of substitution to any or all of them, the power to vote the stock at all regular and special meetings of the stockholders and to vote for, do or assent or consent to any act or proceeding which the Shareholders of said corporation might or could vote for, do or assent or consent to."

Paragraph 3 also provides:

"The vote of the Agents shall always be exercised as a unit, on any matter on which a vote of the stockholders is called for, as any seven of said Agents shall direct and determine. If any seven Agents fail to agree on any such matter, then the question in disagreement shall be submitted for arbitration to some disinterested person (*i.e.*, one having no financial interest in American Independent Oil Company), chosen by the affirmative vote of seven of the Agents, as sole arbitrator."

Then follow provisions for the choice of an arbitrator if seven Agents fail to agree upon the matter, and for the enforcement of his decision.

Then follow two paragraphs dealing with control of directorate action. These are the provisions held invalid by the Chancellor as an unlawful attempt to strip the directors of their statutory right and duty to manage the corporate affairs.

Paragraph 3 then concludes:

"In the event a Voting Trust is established as provided in Paragraph 7 hereof, the provisions of the two preceding subparagraphs shall remain in effect, substituting the words 'Trustee' or 'Trustees' for the words 'Agent' or 'Agents' wherever those words occur in said two subparagraphs."

Paragraph 4 provides for filling a vacancy in the position of Agent. As to the corporate shareholders, the successor is to be named by the shareholder that the Agent was representing. As to Davies, his successor is to be named by the majority of the remaining Agents. Each corporate shareholder has the right to remove its Agent or Agents at any time without cause.

Paragraphs 6 and 7 provide:

"6. Except as herein otherwise provided, the proxies to be given hereunder shall not be revoked and the powers herein delegated to said Agents shall be irrevocable during a period of ten years from and after the date of said Agreement. This Agreement, however, shall terminate if any seven of the Agents hereunder declare in writing that the Agreement is terminated. Unless the Agents by unanimous vote otherwise determine, this Agreement shall also terminate if and when less than 50% of the outstanding shares of American Independent Oil Company remain subject to this Agreement. Upon the termination of said Agreement the certificates representing all of the shares so held under this Agreement and then remaining in escrow or in the hands of said Agents or their successors shall be returned or assigned to the parties then entitled thereto, upon surrender to said Agents of the receipts given for said certificates.

"7. Any seven of said Agents may at any time withdraw said stock certificates from escrow and transfer said stock to the persons then acting as Agents, as trustees to be held under a voting trust. The parties agree, upon the written request of seven of said Agents to execute a voting trust agreement substantially in the form attached hereto marked Exhibit "A", the persons then acting as Agents to be Trustees, and the Share-

holders parties hereto to be Beneficiaries thereunder. The parties do hereby constitute any one of said Agents their attorney in fact to execute said voting trust agreement for them and in their names, in the event any of them should be unable, or should fail or refuse to sign said voting trust agreement upon the written request of seven of said Agents. Upon the execution of said voting trust agreement the Shareholders will surrender to said Agents the receipts given for said certificates."

This agreement, plaintiffs assert, is invalid on its face. Among other contentions they say that in substance, though not in form, it is a voting trust, and that it is void because it does not comply with the provisions of our voting trust statute. Defendants reply that it is not, and was not intended to be, a voting trust, and is a mere pooling agreement of the kind recognized as legal in Delaware by the decision in *Ringling Bros.-Barnum & Bailey Combined Shows v. Ringling,* 29 *Del.Ch.* 610, 53 *A.2d* 441.

The General Corporation Law, 8 *Del.C.* § 218, provides in part:

"(a) One or more stockholders may by agreement in writing deposit capital stock of an original issue with or transfer capital stock to any person or persons, or corporation or corporations authorized to act as trustee, for the purpose of vesting in such person or persons, corporation or corporations, who may be designated voting trustee or voting trustees, the right to vote thereon for any period of time determined by such agreement, not exceeding ten years, upon the terms and conditions stated in such agreement. Such agreement may contain any other lawful provisions not inconsistent with said purpose. After the filing of a copy of such agreement in the principal office of the corporation in the State of Delaware, which copy shall be open to the inspection of any stockholder of the corporation or any beneficiary of the trust under said agreement daily during business hours, certificates of stock shall be issued to the voting trustees to represent any stock of an original issue so deposited with them, and any certificates of stock so transferred to the voting trustees shall be surrendered and cancelled and new certificates therefor

shall be issued to the voting trustees, and in the certificates so issued it shall appear that they are issued pursuant to such agreement, and in the entry of such voting trustees as owners of such stock in the proper books of the issuing corporation that fact shall also be noted. The voting trustees may vote upon the stock so issued or transferred during the period in such agreement specified."

■ This statute was enacted in 1925. 34 *Del.L. c.* 112, § 6. Prior to its passage there was no Delaware decision declaring that voting trusts were lawful at common law—a question upon which the decisions in other states were in disagreement. See 5 Fletcher, *Cyclopedia Corporations,* § 2078. In *Perry v. Missouri-Kansas Pipe Line Co.,* 22 *Del.Ch.* 33, 191 *A.* 823, it was determined that in Delaware, as in New York, voting trusts derive their validity solely from the statute. *"The test of validity is the rule of the statute. When the field was entered by the Legislature it was fully occupied and no place was left for other voting trusts."* Quoted by the Chancellor with approval from *Matter of Morse,* 247 *N.Y.* 290, 160 *N.E.* 374, 376. The statute lays down for voting trusts "the law of their life"; compliance with its provisions is mandatory. Voting trusts not so complying are illegal. *Perry v. Missouri-Kansas Pipe Line Co., supra; In re Chilson,* 19 *Del.Ch.* 398, 168 *A.* 82; *Smith v. Biggs Boiler Works Co.,* 32 *Del.Ch.* 147, 82 *A.2d* 372.

■■ The correctness of the holding in the *Missouri-Kansas* case has never been questioned in Delaware, so far as we know. It has a direct bearing upon the instant case. If any stockholders' agreement provided for joint or concerted voting is so drawn as in effect to occupy the field reserved for the statutory voting trust, it is illegal, whatever mechanics may be devised to attain the result. The provisions of the instrument determine its legal effect, and if they clearly create a voting trust, any intention of the parties to the contrary is immaterial. *Aldridge v. Franco-Wyoming Oil Co.,* 24 *Del.Ch.* 126, 7 *A.2d* 753.

■■ A review of the Delaware decisions upon the subject of voting trusts shows that our courts have indicated that one essential

feature that characterizes a voting trust is the separation of the voting rights of the stock from the other attributes of ownership. In *Peyton v. William C. Peyton Corporation,* 22 *Del.Ch.* 187, 199, 194 *A.* 106, 111, Chancellor Wolcott said:

> "A voting trust as commonly understood is a device whereby two or more persons owning stock with voting powers, divorce the voting rights thereof from the ownership, retaining to all intents and purposes the latter in themselves and transferring the former to trustees in whom the voting rights of all the depositors in the trust are pooled."

This definition was followed in *Aldridge v. Franco-Wyoming Oil Co., supra,* with an additional element—"that the voting rights given are intended to be irrevocable for a definite period". 24 *Del.Ch.* 148, 7 *A.2d* 764. And in *Tracey v. Franklin,* 30 *Del.Ch.* 407, 411, 61 *A.2d* 780, 782, *affirmed* 31 *Del.Ch.* 477, 67 *A.2d* 56, 11 *A.L.R.2d* 990, the Vice Chancellor spoke of the primary purpose of the statute as "the separation of voting rights from the other attributes of ownership for protracted period." To all these elements should be added that of the principal object of such a trust, which is voting control. Note the language of § 218, and see 5 Fletcher, *Cyclopedia Corporations,* § 2075.

When we apply these tests to the Agents' Agreement we find: (1) that the voting rights of the pooled stock have been divorced from the beneficial ownership, which is retained by the stockholders; (2) that the voting rights have been transferred to fiduciaries denominated Agents; (3) that the transfer of such rights is through the medium of irrevocable proxies, effective for a period of ten years; (4) that all voting rights in respect of all the stock are pooled in the Agents as a group, through the device of proxies running to the agents jointly and severally, and no stockholder retains the right to vote his or its shares; and (5) that on its face the agreement has for its principal object voting control of American.

These elements, under our decisions, are the elements of a voting trust.

We find one other significant circumstance.

Paragraph 7 of the Agents' Agreement gives any seven of the eight agents the power to withdraw the stock from escrow and to transform the Agreement into a formal voting trust. Any one of the agents is authorized to sign the voting trust agreement for any shareholder who fails to do so upon the request of any seven of the agents. A form of a voting trust agreement is attached as an exhibit to the Agents' Agreement. A comparison of this form with the provisions of the Agents' Agreement shows that upon the execution of the Voting Trust Agreement the scheme of control functions just as it functions under the Agents' Agreement. Without pausing for a detailed analysis, we note that Paragraphs 2, 4, 5 and 6 of the Agents' Agreement are paralleled (in some cases almost verbatim) by Paragraphs 2, 5, 8 and 10, respectively, of the Voting Trust Agreement. Paragraph 3 of the Agents' Agreement is paralleled in part by Paragraph 3 of the Voting Trust Agreement. The provisions of Paragraph 3 of the Agents' Agreement controlling directorate action remain in effect as part of the Voting Trust Agreement.

Thus the only significant changes made in transforming the Agents' Agreement into a Voting Trust Agreement are the provisions formalizing the trust, viz.: (1) the Agents become Trustees—a change of name and nothing more; (2) the stock with irrevocable stock powers running to the Agents becomes stock registered in their names as Trustees; and (3) voting trust certificates instead of receipts are issued to the stockholders.

To sum up: the substance of the voting trust already existed; the transformation added only the special mechanics that the statute requires.

Now, the provisions of the statute that were not complied with are the requirement that the shares be transferred on the books and the requirement that a copy of the agreement shall be filed in the corporation's principal office in Delaware. The effect was to create a secret voting trust. The provision respecting the filing of a copy in the principal office in Delaware "open to the inspection of any stockholder * * * or any beneficiary of the trust" is a provision obviously for the benefit of all stockholders and of all beneficiaries of the trust, who are

entitled to know where voting control of a corporation resides. And the provision for transfer of the stock on the corporate books necessarily serves, though perhaps only incidentally, a similar purpose with respect to the officers and directors. If the validity of a stockholders' pooling agreement of the kind here presented were to be sustained, the way is clear for the creation of secret voting trusts. The statute clearly forbids them.

The Chancellor took the contrary view. He held the Agents' Agreement not to be a voting trust because (1) title to the stock did not pass to the Agents, and (2) because the Agents are in fact the agents and are subject to the directions of their principals.

The failure to transfer the stock on the books is not a sufficient reason in this case for holding the Agents' Agreement not a voting trust. It is an indication that the parties did not intend to create a voting trust; but that subjective intention is unimportant. The stock here was endorsed in blank and delivered to the agents for deposit in escrow with irrevocable proxies. Transfer of the stock on the books is not essential to effect an irrevocable transfer of voting rights to fiduciaries, divorced from the other attributes of the stock, in order to secure voting control, as the Agents' Agreement demonstrates. It is such a transfer that is the characteristic feature of a voting trust.[1]

■ The fact that the Agents are subject to control by their respective principals does not prevent the agreement from constituting a voting trust. The stock is voted by the Agents as a group. No one stockholder retains complete control over the voting of its stock. It cannot vote its own stock directly; all it can do is to direct its Agent how to vote on a decision to be made by the Agents as a group. The stock of any corporate stockholder may at any time be voted against its will by the vote of the seven other agents. The control of the agents rests upon the provisions that they are severally chosen by the respective stockholders and each may be removed and

---

1. The relationship between the "irrevocable proxy" to fiduciaries and the voting trust is so close that one writer has said: "To achieve irrevocable proxies the voting trust was developed." *Rohrlich, Law and Practice in Corporate Control;* quoted in *Ballantine on Corporations,* § 184.

replaced by the stockholder he represents. In effect, these provisions come to this: that each corporate stockholder participating in the agreement reserves the right to name and remove the fiduciary or fiduciaries representing him. Such a provision is not inconsistent with a voting trust. In fact, the scheme is carried forward to the voting trust set out as "Exhibit A" to the Agents' Agreement. See Paragraphs 3 and 5, paralleling Paragraphs 3 and 4 of the Agents' Agreement. And the alleged continuing control of the Agent by the stockholder clearly would not exist in the event of the death, removal or resignation of Davies in his capacity of Agent. In that case his successor, whether Agent or Trustee, is named by a majority of the remaining Agents or Trustees, as the case may be, and his estate has no control whatever over the Agent so named.

Defendants stress the contention that the parties to the Agents' Agreement did not intend to create a voting trust. As above noted, the intent that governs is the intent derived from the instrument itself. A desire to avoid the legal consequences of the language used is immaterial. Additional arguments (1) that the fiduciaries vested with voting rights are called agents instead of trustees, and (2) that title to the stock did not pass to the agents, have already been noticed.

In support of their argument that the Agents' Agreement creates only a stockholders' pooling agreement and not a voting trust, defendants lean heavily on the decision of this Court in *Ringling Bros.-Barnum & Bailey Combined Shows v. Ringling,* 29 *Del.Ch.* 610, 53 *A.2d* 441. That case involved a true pooling agreement, far short of a voting trust. Two stockholders agreed to act jointly in exercising their voting rights. There was no deposit of the stock with irrevocable stock powers conferring upon a group of fiduciaries exclusive voting powers over the pooled stock. Indeed, the Supreme Court (modifying the decision below) held that the agreement did not provide, either expressly or impliedly, for a proxy to either stockholder to vote the other's shares. The *Ringling* case is clearly distinguishable on the facts.

And although the case recognizes the validity of various forms of pooling agreements, it does not announce, as defendants

appear to think, an unrestricted and uncritical approval of all agreements between stockholders relating to the voting of their stock. Not all pooling agreements are lawful. *Cf. Smith v. Biggs Boiler Works Co.,* 32 *Del.Ch.* 147, 82 *A.2d* 372.

Defendants would push the general statements of the *Ringling* case to unwarranted lengths. They quote extensively from that part of the opinion which deals with the scope of the voting trust statute. Among other things, the Court said [29 *Del.Ch.* 610, 53 *A.2d* 447] :

> "But the statute does not purport to deal with agreements whereby stockholders attempt to bind each other as to how they shall vote their shares."

██ We gather that defendants go so far as to say that a pooling agreement may assume any form whatever without running afoul of the voting trust statute. Thus, if we understand defendants' argument, a pooling agreement may, through the medium of fiduciaries with exclusive voting powers, lawfully accomplish substantially the same purposes as a voting trust and thus avoid compliance with § 218. We disagree. Obviously, as a pooling agreement in substance and purpose approaches more and more nearly the substance and purpose of the statute, there comes a point at which, if the statute is not complied with, the agreement is illegal. A pooling agreement may not escape the statutory controls by calling the trustees agents and giving to the stockholders receipts instead of voting trust certificates. If this were not so, stockholders could, through the device of an agreement such as the one before us, accept for themselves the chief benefits of the statute: unified voting control through fiduciaries for an appreciable period of time; and escape its burdens: the requirements for making an open record of the matter, and the limitations in respect of time. If the agreement before us is upheld, what is there to prevent a similar agreement for 15 years—or 25 years?

Although the general language of the *Ringling* case, if read literally, may seem to lend some support to the position of the defendants, we do not think that it should be carried so far as to permit the result urged by them in this case.

Defendants also rely on the decision of the Chancellor in *Aldridge v. Franco-Wyoming Oil Co., supra.* In that case an agreement provided for the deposit of shares with a trustee and the issuance of "bearer certificates" to the depositing stockholder. It was held not to be a voting trust, because under the agreement each stockholder retained full control of his stock. He could withdraw the stock from the trust at any time, or, as long as it remained in the trust, he could obtain a proxy to vote it at any time. The *Aldridge* case is not in point.

For the foregoing reasons, we are compelled to disagree with the holding of the Chancellor upon the question discussed. We are of opinion that the Agents' Agreement is void as an illegal voting trust.

Our conclusion upon this question makes it unnecessary to discuss any of the other questions raised on the appeal.

The cause is remanded to the Court of Chancery of New Castle County, with instructions to vacate paragraphs (2) to (5) inclusive of the order of October 24, 1956, and to enter a further order consistent with this opinion, with such provisions for injunctive relief, if any, as the Chancellor may determine to be appropriate.