In the Matter of FARM INDUSTRIES, INC.,
a Delaware Corporation.

*New Castle, November 20, 1963.*

*Hugh L. Corroon,* of Berl, Potter & Anderson, Wilmington, and *Wesley J. Liebeler,* of Carter, Ledyard & Milburn, of New York City, for petitioners. ·

*Howard L. Williams,* of Morris, James, Hitchens & Williams, Wilmington, for defendants.

SEITZ, Chancellor: The petitioner Herman Knaust has applied for a summary order for the election of directors of Farm Industries, Inc., a Delaware corporation. He alleges that he owns a majority of the outstanding Class A and Class B common stock of the corporation and that together with his immediate family he owns 73% of all the issued and outstanding stock. He further alleges that the annual meeting of stockholders which should have been held, according to the by-laws, on February 15, 1963, has never been noticed or held.

The defendants, John A. Bouvier, Jr., Joseph T. Garland, and Morris Rosenblum, are certain officers and directors of Farm Industries. They have filed an answer on behalf of themselves and the corporation and admit that the annual meeting has not been held.

They contend, however, by way of cross-claim against the petitioner and others, that under the terms of an agreement dated November 2, 1960, the Class B stock is entitled to elect five of the nine directors of the corporation at the annual meeting of stockholders. They further contend that under the above agreement of November 2, 1960, which was executed by all the holders of Class B stock, and also under a Voting Trust Agreement of August 21, 1961, which was

entered into by the petitioner and certain members of his family, the defendant, John A. Bouvier, Jr., is authorized to vote the Class B stock, or a majority thereof, as the holder of an irrevocable proxy or as voting trustee. They pray therefore that the relief requested by the petitioner be denied and that the court specifically enforce the obligations of the petitioner and the members of his family as aforesaid by compelling such persons to transfer an irrevocable proxy to Bouvier and to deposit with him their Class B stock as voting trustee.

Petitioner replies to the cross-claim admitting the execution of the agreement of November 2, 1960 and the Voting Trust Agreement of August 21, 1961 by himself and the others involved. He urges, however, that the cross-claim be dismissed on the grounds, inter alia, that the defendants in effect obtained such agreements by overreaching and later breached the purported contracts themselves. He invokes in this regard the equitable doctrine of unclean hands.

After the petitioner filed his reply to the cross-claim, the petitioner's wife, Katherine Knaust, and his sons, Warren Knaust and H. Karl Knaust, all of whom are named as defendants therein, submitted generally to the jurisdiction of this court. They have joined in the reply to the cross-claim, and reference hereinafter to the "petitioner" shall be deemed to include all of these persons. Parenthetically, the Class B stock certificates held by the members of the Knaust family have been deposited with the court. Thus, at the present time all the signatories of the November 2, 1960 agreement and of the voting trust agreement of August 21, 1961 are now before the court as well as the certificates representing the shares whose voting rights are in issue.

The background for the issues presented by the cross-claim and reply are as follows. Prior to November 1960, Herman Knaust and his brother, Henry Knaust, owned all the common stock of two New York corporations, Knaust Brothers, Inc. and K-B Products Corp., in equal amounts, except for a few shares owned by their respective families. The Knausts were at one time the world's largest producers of mushrooms.

For reasons which do not appear in the record, the brothers Herman and Henry fell into disagreement. Herman was engaged in the

promotion of Iron Mountain Atomic Storage Corporation which was intended to provide storage facilities on a commercial basis for valuable documents. Admittedly, the Knausts' mushroom business had begun to falter financially although the parties herein are not in strict agreement as to the cause. In part at least the decline in the fortunes of Knaust Brothers and K-B Products has been attributable to severe competition in the domestic market by mushrooms imported from the island of Formosa.

In July of 1960, Herman was forced to withdraw from the management of the two mushroom companies at the instance of certain creditors. Henry, however, signed an agreement giving Herman an option to buy his fifty per cent interest in the two companies for $200,000 and certain other considerations. Herman was required to agree, however, that if he could not meet these terms, he would deliver his stock in trust to Henry. It was at this juncture that the defendants were invited to join the Knausts' business venture.

It is apparent from the record that the mushroom business was in serious need of working capital. Herman Knaust and his immediate family, however, not only could not meet such needs but were not then in a position to pay to Henry Knaust the purchase price for his half interest in the business. Also, Herman Knaust was personally indebted to the two mushroom companies in the amount of $300,000 which apparently had been expended in the organization of Iron Mountain.

At the recommendation of one of the defendants, Joseph Garland, who is a son-in-law of Herman Knaust, John Bouvier was brought into the Knaust enterprises to provide managerial skills as well as the required financial assistance. The outcome of the negotiations among the interested parties is evidenced in part by the agreement of November 2, 1960. Under the terms of that agreement Herman Knaust and the members of his family agreed to raise $125,000 for the purpose of purchasing the outstanding stock interest of Henry Knaust in Knaust Brothers and K-B Products. The balance of $75,000 was to be raised by the defendants Rosenblum ($50,000) and Bouvier ($25,000). Herman Knaust also agreed to cause Iron Mountain to secure a loan of $300,000 to be used by the parties under the terms of the agreement

to stabilize the financial condition of the two mushroom companies. The purchasers were to share in the stock acquired from Henry Knaust in proportion to their respective cash investments. Thus, Rosenblum, for example, was to have a one-fourth interest in the purchased stock and a one-eighth interest in the entire business.

Next, the parties mutually agreed that they would cause a Delaware corporation to be formed which would have both Class A and Class B common stock. Both classes were to be identical in every respect except that the Class A would be authorized to elect four of the proposed board of nine directors and the Class B to elect five. The parties further agreed that their Knaust Brothers and K-B Products shares should be exchanged share and share alike for the Class A and Class B stock of the proposed Delaware corporation when organized.

Herman Knaust further agreed that he would transfer all his stock in Iron Mountain to Knaust Brothers in exchange for the cancellation of his personal indebtedness to the two mushroom companies of $300,000 and for a non-interest bearing note in the amount of $60,000.

Finally, it was provided, inter alia, that when the Delaware corporation was organized and the stock issued, all the holders of the Class B stock would give an irrevocable proxy to Bouvier to be surrendered by him only when all the bank debts of Farm Industries and its subsidiaries were paid off and other past due accounts made current. Other provisions specified the duties attaching to the various executive positions in the proposed corporation and designated the particular office that certain of the parties joining in such agreement were to hold when the corporation was duly organized. To the extent that these provisions become relevant to the matters in issue discussed later herein, they are set forth in greater detail.

Farm Industries was thereafter duly organized under the laws of this State. As noted later herein, a technical error was made in the incorporation process in that the special voting rights of the two classes of stock were not set forth in the certificate of incorporation through subsequently included in the by-laws.

Later events may be described briefly. Bouvier, as provided by the agreement, became the president of Farm Industries and its subsidiaries, Knaust Brothers and K-B Products. Herman Knaust became chairman of the board though, as agreed, he was also in charge of the Iron Mountain subsidiary. In general, Bouvier as president provided active executive direction to the corporation while Herman Knaust was its "elder statesman". This was so even though Bouvier was absent in Europe during part of 1961 and only returned in the month of August. During his absence he corresponded on a confidential basis with Garland, then Executive Vice President and later General Manager, who kept him informed as to the progress of events. In view of the difficult financial situation Bouvier's primary task appears to have been the arranging of loans sufficient to provide needed working capital for the mushroom subsidiaries. In order to secure the necessary funds Bouvier was obliged to guarantee personally the repayment of certain substantial obligations of Farm Industries or its subsidiaries. I refer particularly to a bank loan of $500,000 in the spring or summer of 1961 which appears to have led to the execution of the Voting Trust Agreement in August of that year.

The downward trend in the fortunes of the two mushroom companies continued after the organization of Farm Industries and the shift in management to Bouvier and Garland although efforts were made to increase production and lessen costs. Dissension began to develop between the Knausts on the one hand and the Bouvier group on the other. Largely this resulted from the fact that the 1960 agreement placed control of what had been a family business in the hands of newcomers who sought to implement policies of their own. The adverse financial situation obviously aggravated the difficulties.

Late in August 1961, Garland was appointed General Manager of the mushroom operation by Warren Knaust, then Vice President in charge of production. This in effect put Garland in control in the production area. Next, in the summer and fall of 1961, efforts were made by the Bouvier group to prevent Herman Knaust from interfering with the lines of operational command established by the new management. Ultimately this led to a request that he "absent" himself from Farm Industries for several months. Thereafter, on November

29, 1961, he was removed as president of Iron Mountain by the board of that subsidiary, and Bouvier was elected in his place. Apart from the changes referred to above, however, the executive arrangement remained as set forth in the November 2, 1960 agreement. The financial situation did not thereafter improve and sometime after the present suit and a companion suit in New York were filed, the two mushroom subsidiaries filed petitions under Chapter XI of the Bankruptcy Act.

There is no question that a stockholders' election of directors should be ordered. The issue presented here is what the voting rights of the respective parties will be at such election. Petitioner and the members of his family contend that the defendants are not entitled to exercise the voting rights purportedly vested in them by the 1960 and 1961 agreements. They claim that the November 2, 1960 agreement resulted from bad faith and overreaching on the part of the defendants, that the defendants themselves are guilty of breaches of that agreement, and that the defendants have abused the position of dominance and control which that agreement has given them over the affairs of Farm Industries and its subsidiaries.

Does the record support these charges of "unclean hands"? I turn first to the contention that the initial agreement itself was the result of bad faith and overreaching. The Knausts, in support of such claim, rely principally on the fact that Morris Rosenblum, one of the defendants, acted as attorney for Herman Knaust in negotiating such agreement. They point out that by virtue of the agreement the Knausts surrendered control of the mushroom companies and also of the valuable Iron Mountain asset. They further indicate that Rosenblum became the purchaser of approximately a one-eighth interest in the entire enterprise for the sum of $50,000, which they contend was grossly inadequate, and that he later became a director and officer of Farm Industries as a nominee of Bouvier, the chief beneficiary of the agreement. Thus, the Knausts urge that the entire agreement was tainted by the bad faith of the attorney who allegedly encouraged the Knausts to execute it and that the other defendants knowingly participated therein.

In my opinion the record when viewed in proper perspective does not fairly sustain these contentions. The dominant factor in the negotiation of the November 2, 1960 agreement was undoubtedly the serious financial condition of the mushroom companies and the inability of Herman Knaust to provide adequate financing. Unfortunately the record herein does not permit a fully detailed description of the events underlying this transaction. It appears, however, that in July 1960, current liabilities of the mushroom companies exceeded current assets by $500,000 and that a bank was threatening to call a demand note involving a total sum of $280,000. The bank agreed to extend the loan provided that management of the company was shifted from Herman to his brother Henry. At this juncture Herman and Henry executed an option agreement dated July 14, 1960, by which Herman was given an option to purchase Henry's stock for the sum of $200,000, provided that Herman could secure Henry's release from all personal obligations for the debts of the two companies. The agreement also provided, however, that if that option was not exercised within one week, i. e., by July 21, 1960, Herman would cause his stock to be delivered to Henry in trust for 20 years which Henry could deal with, under certain conditions, as his own. The trust could only be earlier terminated if the stock or the assets of the companies were sold, if Herman were to repay his $300,000 indebtedness to the companies and arrange for the redemption of about $300,000 of the preferred stock of Iron Mountain held by such companies, or if Herman within three years purchased Henry's stock for $200,000 or twice the book value, whichever was greater, and secured a release of his liability for the companies' obligations. The agreement further provided that upon failure to exercise the option by July 21, 1960, Herman would resign as an officer and director of the mushroom companies.

Herman Knaust was unable to exercise the option agreement by July 21, 1960, and thus lost control of his own stock as well as control of the mushroom companies. The agreement which brought the defendants into the enterprise was executed under these prevailing circumstances.

I think it apparent that under such circumstances the terms of the November 2, 1960 agreement can hardly be considered "unfair".

Rosenblum and Bouvier invested $75,000 in an enterprise which seemingly was threatened with bankruptcy. Neither had any financial stake in the enterprise up to that time which they were called upon to protect. With the funds they provided, Herman Knaust and his family were able to terminate the trust over his own stock and buy out Henry's interest. By the terms of the November 2, 1960 agreement he and the members of his family were again permitted to have a voice in management. The conditions imposed were reasonable, viz., that Iron Mountain become a subsidiary of the mushroom companies (73% of whose stock would be owned by the Knausts) and that the defendant Bouvier be permitted to name five members of the new board of directors.

I am satisfied that there was no impropriety in Rosenblum's purchase of an interest in the business himself. There is nothing to indicate that any unfair advantage was taken by him by virtue of his position as Herman Knaust's attorney. I find that Herman Knaust fully understood the consequences of the November 2, 1960 agreement with respect to ownership and control of the Knaust enterprises when he executed it and conclude that no equitable grounds appear in that regard for refusing to enforce it.

Next, I consider petitioner's claim that the defendants were guilty of breaches of contract and also abused the position they obtained by virtue of the agreement. All these claims are somewhat interrelated and are perhaps better understood when viewed against the background of events that unfolded after the signing of the November 2, 1960 agreement. That agreement, as noted before, permitted Bouvier to name five members of the Board of Farm Industries. The agreement also specified how the managerment of the corporation was to be organized once the incorporation process was completed. Herman Knaust and his sons, Warren and Herman Karl, were each allotted executive positions, but the principal posts were given to Bouvier and Garland.

The obvious result of this arrangement was that the Knausts were given only a subordinate position in the direction of corporate affairs. The new managers set about instituting what they considered to be necessary reforms which not unexpectedly met with a certain amount

of resistance. This led ultimately, as noted before, to Garland's appointment as General Manager of the mushroom operation and Henry Knaust's replacement by Bouvier as president of Iron Mountain.

■ The Knausts claim that the defendants violated the terms and the spirit of the 1960 agreement by displacing their authority within the corporate structure. They appear to take the position that that agreement was intended to "freeze" the management by forbidding any change in executive personnel without the consent of the person involved. While I recognize that such agreements are frequently executed for the purpose of assuring a minority stockholder a voice in the management of the company, I think that a proper construction may be achieved only by considering the circumstances surrounding the execution of the particular instrument and the actions sought to be taken thereunder.

I am of the opinion, after reviewing the record herein, that the parties executing the November 2, 1960 agreement fully understood that a condition of Bouvier's joining the enterprise was that he would have the dominant voice in the management. By the agreement he undertook the responsibility of making satisfactory arrangements with the bank holding the demand obligation of $200,000. He was given the power by proxy to name five members of the board, and his responsibilities as President were to include, inter alia, operations and management and banking relations.

I think it fair to conclude that one purpose of the 1960 agreement was to make it certain that while the Knausts would retain a considerable voice in the affairs of the enterprise, they could not otherwise prevent the implementation of new policies by creating a corporate deadlock.

The alleged breach of contract upon which the petitioner Herman Knaust principally relies is the fact that he was replaced by Bouvier as president of Iron Mountain. The 1960 agreement states that the Chairman of the Board of Farm Industries shall be "in charge of" Iron Mountain. Petitioner argues that since by the terms of that agreement he was to be chairman, it was improper for him to be re-

placed by action of the board of Iron Mountain, which presumably was dominated by Bouvier, at a meeting which he did not attend.

Assuming for the moment, without deciding, that the agreement had the effect of assuring Herman Knaust the chairmanship for an indefinite period of time, was it an act of bad faith or, more particularly, a breach of contract for the defendants to cause him to be removed as president of Iron Mountain? I note first that the agreement does not specifically state that the petitioner shall be "president" of the subsidiary. At the time the 1960 agreement was entered into by the parties, Herman Knaust owned substantially all the common stock of Iron Mountain personally although the mushroom companies held about $300,000 of preferred stock and a personal obligation in·like amount. As part of the 1960 transaction the defendants required Iron Mountain to become a subsidiary of the mushroom companies in exchange for the cancellation of the personal obligation and the issuance to Herman Knaust of a note for $60,000. This step was undoubtedly intended to substitute an asset of real value, i. e., the Iron Mountain property, for an asset of somewhat dubious value, viz., the unsecured obligation of Herman Knaust.

While it appears that the parties intended to make some special arrangement with respect to the management of Iron Mountain, I do not think that they intended to exempt it from the overall scheme of corporate control envisaged by the 1960 agreement. Thus, I do not think that when the agreement stated that the chairman should be "in charge of" Iron Mountain, that was meant to imply that a special sphere of control was cut out for that particular subsidiary. Of the three operating companies only Iron Mountain appears to have been operating "in the black" at the time Farm Industries was formed. If the defendants were incapable of implementing their policies with respect to that subsidiary, then the security which they purported to provide for themselves under the agreement would have been of a most dubious quality.

I am persuaded that as fairly read, the agreement merely provided that the chairman should have general oversight with respect to the policies of Iron Mountain. Active management I think was intended to be geared to the other provisions of the agreement which

placed the responsibility for such matters in other hands. Moreover, I believe that this view comports with the parties' own understanding of the matter. When the climactic dispute arose between Herman Knaust and the Bouvier group with respect to the implementation of certain policies, Knaust was asked to absent himself for several months from the company. Initially he agreed, but after one month unexpectedly returned from a trip to Europe. Thereupon, the board of Iron Mountain voted to replace him, both his sons concurring therein. I am of the opinion that under the circumstances the replacement of Herman Knaust by Bouvier was a reasonable exercise of powers which were implicit within the agreement itself, an adequate showing having been made for the necessity of such removal. Thus, I conclude that no breach of contract was there involved.

Claims of a similar nature were made with respect to Herman's sons, Warren Knaust and H. Karl Knaust. I find such claims to be without merit on the present record.

█ █ Petitioner also contends herein that the so-called management provision is invalid because it tends to limit the discretion of the corporate directors. He further contends that such provision is not severable from the rest of the terms of the agreement and thus that the entire agreement must fall. Petitioner in effect is arguing that by the agreement the parties intended to preclude the boards of directors from replacing those named initially to the various corporate offices. He admits that such a construction only arises by implication. Since the adoption of that implication would, according to petitioner, result in a finding of complete invalidity, the court believes that a more reasonable finding is that the parties did not so intend. Certainly, if reasonably possible, the court should adopt a construction which would uphold an agreement rather than one which would invalidate it. My finding here, moreover, is supported by the by-laws of Farm Industries which clearly vest the board with the power to elect officers and fix their compensation.

Next, I turn briefly to a claim of self-dealing asserted against Bouvier concerning the sale and leaseback to a separate corporation controlled by Bouvier of certain facilities belonging to Knaust Brothers. It is said that Bouvier improperly received, directly or

indirectly, interest in the amount of 12%. Petitioner claims that this and other actions of Bouvier indicate a misuse of the position of dominance and control given him by the agreements in issue. Thus, petitioner contends that the court should refuse to grant Bouvier and the other defendants any relief with respect to such agreements.

██ It is settled law in Delaware that relief may be barred by the doctrine of unclean hands only by reason of some conduct relating directly to the matter in controversy. *Walter v. Walter,* 36 *Del.Ch.* 280, 129 *A.2d* 253. Since none of the claims with which we are now concerned have any relation to the formation of the agreements in issue or to purported breaches thereof, I am of the opinion that that doctrine may not be invoked so as to deny relief. That is not to say of course that petitioner may not otherwise assert these claims as the basis of an independent action against the defendants, if so desired.

Other issues raised by the petitioner have been considered and resolved in a manner consistent with the conclusions herein reached. It follows from the foregoing that the defendants are not chargeable with unclean hands on any score with regard to the agreements in issue.

Petitioner contends, however, that even if the agreements involved were validly executed and are otherwise free of fault, they cannot be enforced herein as a matter of law. As to the November 2, 1960 agreement, petitioner says that the proxies contemplated by such agreement would not have been "irrevocable" if in fact transferred to Bouvier and, if irrevocable, they would have amounted to an illegal voting trust. Next, as to the Voting Trust Agreement, petitioner urges that since none of the formal steps allegedly prescribed by 8 *Del.C.* § 218 for the effective creation of a voting trust were ever carried out, that purported trust must fail.

Petitioner urges one further matter of defense. He points out that the purported effect of both these agreements was to give Bouvier control of the board of Farm Industries by virtue of the assumed power of the Class B stock to elect five of the nine corporate directors. He now takes the position that 8 *Del.C.* § 102 and 8 *Del.C.* § 151 impose a mandatory requirement that such voting rights, in order to

exist, must be set forth in the certificate of incorporation. Admittedly, while both Class A and Class B stock are authorized by the certificate of Farm Industries, nothing appears therein as to the respective voting rights of these classes. Article 6, Section 1 of the corporate by-laws, which were later adopted, does in fact set forth such rights. No action was ever taken to amend the certificate so as to include the pertinent terms. Thus, petitioner contends that all the common stock of both classes are entitled to an equal vote, share for share, in matters involving a vote of the stockholders.

*Section 212 of the Delaware Corporation Law* states:

"Unless otherwise provided in the certificate of incorporation, each stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of the capital stock held by such stockholder, * * *".

The defendants tacitly concede that §§ 102 and 151 govern the existence of the voting rights which they are here seeking to establish and that such provisions in substance require that the voting rights and powers of corporate stock be set forth in the certificate. Thus, defendants do not contend that they have in fact complied with the statute. Rather they urge that the court may implement the November 2, 1960 agreement by permitting the parties to vote as if the necessary voting provision had in fact been included in the certificate.

It is not necessary to consider this most doubtful "as if" proposition because of my decision on the request specifically to enforce the 1960 and 1961 agreements.

Assuming that under the present certificate each share of both the A and B is entitled to vote for all nine directors, can it be said to reflect a failure to implement the intentions of the parties as expressed in the November 2, 1960 agreement? It is apparent from a reading of such agreement that the parties did not specify or even consider the location of the voting rights provision in any particular legal instrument. Obviously they intended that the provision should be made legally effective since it was one of the keystones of the parties' agreement. The record shows that the failure to include the voting

rights provision in the certificate resulted from an omission on the part of the attorney who handled the incorporation process. Accordingly, the defendants here take the position that the court may grant such equitable relief as will rectify the error that was inadvertently made.

I pause to note that the situation present here is significantly different from that in *Gaskill v. Gladys Belle Oil Co.*, 16 *Del.Ch.* 289, 146 *A.* 337. There certain preferences were set forth in the certificate of incorporation at the time of incorporation which the parties subsequently attempted to change by means of a by-law. Since as a practical matter the certificate alone would have had the status of a public record, later purchasers of the common could undoubtedly have been misled by the fact that the preferences of the preferred stock set forth in such certificate had been considerably enlarged by the later by-law. There is nothing in the opinion of the then Chancellor to indicate that the common and preferred stockholders at the time of dissolution were the same persons who had earlier approved the by-law enlarging the preferences.

One further point in that case I think is of some significance. The stockholders who approved the by-law in the Gladys Belle Oil case understood that it was a by-law they were passing. They expressly provided that the by-law involved should have the same force and effect as if it were in fact a part of the certificate of incorporation. Thus, they intended to effectuate their purpose by a particular legal device or instrument. Here it can fairly be said that the parties merely intended that the attorney in charge of the incorporation process select any device prescribed by law for making the voting provision effective and that they were otherwise wholly indifferent as to the particular device to be used.

*Brooks v. State*, 3 *Boyce* 1, 26 *Del.* 1, 79 *A.* 790, 51 *L.R.A.,N.S.*, 1126, and *Standard Scale and Supply v. Chappel*, 16 *Del.Ch.* 331, 141 *A.* 191, which were cited by the Chancellor in Gladys Belle Oil, are also I believe readily distinguishable from the present case.

In the Brooks case the corporation in question attempted to create a class of non-voting preferred stock in its charter under the authority

of the General Corporation Law in effect at the time of its incorporation. The Supreme Court there held that the statutory provision relied upon by the incorporators violated *Article* 9, *Section* 6 of the Constitution of 1897, *Del.C.Ann.* which was construed as requiring that each share of stock of a Delaware corporation have one vote. The court further held that the right to vote attached to the share of stock itself and could not be eliminated by any form of wavier on the part of the holder. Thus, the Brooks case differs substantially from the present case in that the action sought to be taken there could not lawfully have been accomplished regardless of the "form" which the parties chose for adjusting the voting rights of the preferred stock.

In *Standard Scale & Supply Corp. v. Chappel,* cited above, the court held that a restriction printed on a stock certificate, which purported to restrict the right to vote the shares represented thereby under certain conditions, could not be enforced against a purchaser of the stock where there was no authority for the restriction in the corporation's certificate or by-laws and the holder was not a party to any agreement with respect to such stock, assuming any such agreement existed. The court noted therein that the printed restriction did not by its terms bar the right to vote in all cases and also that the purchaser's predecessor had in fact voted the shares though his stock certificate had contained the same voting limitations on its face. The circumstances presented by that case I think also differ substantially from those in the case now before the court.

█ May the court order the certificate of incorporation of Farm Industries to be reformed so as to reflect the agreement of the parties with respect to the voting rights of the Class A and Class B stock, the stock still being held by the parties to the agreement and no third-party interest being involved? While no Delaware case has been found where such relief has been granted under any circumstances, the power of a court of equity to grant such relief has nowhere been denied.

The case of *Millspaugh v. Cassedy,* 191 *App.Div.* 221, 181 *N.Y.S.* 276, is very persuasive here. The certificate of incorporation of the company there involved authorized the issuance of both common and preferred stock. The voting rights of these classes were not further

delineated in the certificate. At the first meeting of the incorporators, however, a by-law was adopted which purported to disfranchise the preferred stock.

The lower court found that it was the intention and purpose of the incorporators that the preferred stock should have no voting power and that the sole voting power should be vested in the common stock of the company. Furthermore, the court found that the attorney who prepared the certificate of incorporation was advised of the intention of the incorporators and was directed to prepare the papers to effectuate such intention. The court also found that the attorney in attempting to carry out the direction of the incorporators prepared the by-law involved but failed to insert the provision in the certificate of incorporation. The by-laws were thereafter unanimously adopted at the first meeting of the incorporators which was held under the supervision of the attorney, and the trial judge found that it was the intention of the attorney and the stockholders present at the meeting, representing all the capital stock of the company, that the preferred stock should have no voting power.

The appellate court held (181 *N.Y.S.* 276) that although the preferred stockholders had acted in accordance with the purported limitation on their voting rights for a period of twenty years, the by-law was legally ineffective to accomplish the purpose which the incorporators had sought to achieve. The court concluded, however that the omission in the certificate was the result of a mutual mistake of the parties and could be rectified by a decree ordering the certificate to be reformed in accordance with the intentions of the parties. Thus, it affirmed the decision below.

Under the circumstances present here I am satisfied that the failure to delineate the voting rights of the Class A and Class B stock in the certificate of incorporation resulted in an instrument which in its legal effect does not truly express the intentions of the parties. This situation, which amounts to mutual mistake, provides, in my opinion a legally sufficient basis for causing the certificate to be reformed so as to reflect their intentions. It follows therefore that, assuming the agreement of November 2, 1960 is otherwise legally en-

forceable, it should be reformed by appropriate action to reflect the true intent of the parties.

Petitioner next says that the voting trust agreement of August 21, 1961, is wholly void and of no effect because the parties never took the steps prescribed by 8 *Del.C.* § 218 to implement the trust formally. Petitioner thus contends that the court may not specifically enforce that agreement under the governing Delaware precedents. He does not dispute that the agreement is supported by adequate consideration nor does he suggest that the voting trust contemplated by the agreement would be defective if the parties had taken appropriate steps to carry such agreement into effect by depositing their shares, etc.

Apart from the equitable defense of unclean hands, which has already been considered, petitioner offers no sound reason why the voting trust agreement may not be specifically enforced. The Delaware cases cited by the petitioner, while undoubtedly upholding the view that the provisions of § 218 are mandatory, do not suggest that a voting trust agreement which otherwise contemplates full compliance with the terms of the statute may not be specifically enforced at the instance of a party thereto, especially where as here, there is no third-party interest involved.

In *Abercrombie v. Davies,* 36 *Del.Ch.* 371, 130 *A.2d* 338, reversing 35 *Del.Ch.* 599, 123 *A.2d* 893, the Supreme Court held that an Agents' Agreement there in issue constituted an illegal voting trust and thus was void in its entirety. While the agreement contemplated a conversion of the "agency" arrangement into a formal voting trust under certain circumstances, this court, on remand (36 *Del.Ch.* 445, 131 *A.2d* 822), held that the effect of the Supreme Court's decision was to terminate any obligation of the parties under such agreement. Thus, there was no legally subsisting agreement to support judicial enforcement of the conversion provision. The court also held that the deficiences in the agreement could not be cured by taking steps to meet the requirements of the voting trust statute since such steps had not been part of the agreement of the parties.

In other instances where judicial enforcement of a voting trust agreement was refused, the court found that the agreement of the parties envisioned action in violation of the mandatory provisions of the voting trust statute. In *Perry v. Missouri-Kansas Pipe Line Co.,* 22 *Del.Ch.* 33, 191 *A.* 823, the court refused to enforce an agreement which contemplated a voting trust of eleven years duration. In *Appon v. Belle Isle Corporation,* 29 *Del.Ch.* 122, 46 *A.2d* 749; aff'd. 29 *Del.Ch.* 554, 49 *A.2d* 1, this court held that a purported extension of a voting trust agreement which was executed more than one year prior to the terminal date of the trust was a nullity since it did not conform with the requirements of the statute. In In re *Chilson,* 19 *Del.Ch.* 398, 168 *A.* 82, the court held a voting trust agreement invalid because the parties had agreed thereunder that their original stock certificates should be returned to them, rather than voting trust certificates, after the initial transfer to the trustees.

In *Smith v. Biggs Boiler Works Co.,* 32 *Del.Ch.* 147, 82 *A.2d* 372, it was held that a voting trust agreement could not be enforced where the parties thereto contemplated the establishment of a present trust, but the certificates which were to constitute the res were held in escrow by a third party upon conditions which might never be fulfilled.

Here, the agreement of the parties does not envision any action not in conformity with the terms of the voting trust statute, nor is there any circumstance precluding the establishment of a present trust as contemplated by such agreement. Although no attempt was made to comply with the statutory provisions concerning the filing of a copy of the agreement until this action was filed, there is no showing of any intention on defendants' part to abandon the agreement. Intervening rights of third persons are not involved, and there has been no change of position on the part of the petitioner or the other concerned parties in reliance on any supposed abandonment. *Hirschwald v. Erlebacher, Inc.,* 27 *Del.Ch.* 180, 33 *A.2d* 148 aff'd on opinion below, 27 *Del.Ch.* 343, 36 *A.2d* 167. I conclude therefore that the voting trust agreement of August 21, 1961 should be specifically enforced.

Next, I turn briefly to the provision of the agreement of November 2, 1960 by which all the holders of Class B stock agreed to deliver

an "irrevocable proxy" to Bouvier to vote such stock until such time as the bank debts of Farm Industries and its subsidiaries were paid off and all past due accounts made current. The defendants seek specific performance with respect to that provision.

The defendant Bouvier, as voting trustee, will have absolute voting control of the Class B stock. What the relationship would be between Bouvier's status as the holder of an irrevocable proxy and his status as voting trustee is not entirely clear. In any event the defendants have not briefed the serious issue as to the enforceability of the provision for the creation of a proxy. Therefore, unless defendants desire to press the matter, the court will assume that defendants are content with the relief granted herein.

The order to be entered hereon will provide the mechanics for first implementing the reformation and specific performance aspects of this matter including a provision directing the depositing stockholders either to endorse the certificates or to execute blank stock powers. It will next direct the holding of a stockholders' meeting to elect directors.

Present order on notice.