**CALUMET INDUSTRIES, INC.,**
**Plaintiff,**

·v.

**Robert S. MacCLURE et al., Defendants.**

**No. 78 C 1006.**

United States District Court,
N. D. Illinois, E. D.

May 3, 1978.

Lowell E. Sachnoff, Dean A. Dickie, Jack L. Block, Andrew Schatz, Sachnoff, Schrager, Jones, Weaver & Rubenstein Ltd., Jesse J. Holland, Holland & Holland, J. Samuel Tenenbaum, Becker & Tenenbaum, Chicago, Ill., for plaintiff.

Francis J. Higgins, John W. Rotunno, Robert C. Koch, Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

This case arose out of a struggle for control of the management of Calumet Industries, Inc. ("Calumet"), a Delaware corporation operating principally in Chicago in the business of oil refining and lubricant manufacturing. The case is now before the court on the plaintiff's motion for a preliminary injunction. This memorandum opinion and order will constitute the court's findings of fact and conclusions of law for the purposes of F.R.C.P. 52(a).

Calumet was incorporated in 1961, for the purpose of acquiring the assets and business of its predecessor, Calumet Refining Company. Harry J. Fair, Jr. participated in the organization of Calumet and became its Chief Executive Officer. Mr. Fair is presently Chairman of the Board and President of Calumet. Also involved in the organization of Calumet was the defendant Robert S. MacClure, who served as a director from November of 1961 to July of 1962 and again from July, 1964 to April, 1977. Mr. Mac-Clure is the owner, beneficially or of record, of an aggregate of 42,730 shares of Calumet common stock.

As of March 2, 1978, there were approximately 420,653 shares of Calumet stock outstanding.

The defendant Robert A. Podesta was a member of the Board of Directors of Calumet from July, 1974 to January, 1976. He has been the owner of 7,740 shares of Calumet stock since 1963; he purchased an additional 2,000 shares in January, 1978.

The defendant Woolard & Co., Inc. is a registered broker-dealer which was the principal market maker for Calumet stock until approximately January 23, 1978. The defendant Francis Woolard is the sole owner of the Woolard & Co. firm, and Robert Woolard is a trader employed by the firm. Francis Woolard owns 1,550 shares of Calumet stock; Robert Woolard owns 5 shares.

The defendants Bannister Bray (as Trustee), Evelyn Bray (individually and as executrix of the Ulric Bray estate), and Eugene Slaby (collectively "Bray Group") are the owners of 50,000 shares of Calumet stock. These defendants received the stock as the result of the dissolution, in the fall of 1977, of the Bray Oil Company, a limited partnership ("Bray Partnership") and the death of its dominant general partner, Dr. Ulric Bray. The defendant Bray Oil Company, Inc. ("Bray Corporation") is the successor to

the Bray Partnership. The Bray Partnership was a joint venturer with Calumet in an unsuccessful attempt to produce oil-soluble sulfonates at Calumet's petrochemical plant at Natchez, Mississippi. In addition, the Bray Partnership held Subordinated Notes in the principal amount of $200,000 of Ridge-Wheel Properties, Inc., which is 83⅓% owned by Calumet. The Bray Corporation claims that Calumet is obligated to pay these notes.

The defendants Edward Carman, Charles Edward Kelley, Howard Showalter and Erving Sternberg are shareholders of Calumet, holding 3,000, 1,000, 2,300, and 6,475 shares respectively.

For the past several years, MacClure and Podesta have been dissatisfied with management decisions being made by Fair. By November or December of 1976, the two had begun to discuss and explore various ways to alter the management of the corporation, including the possibility of waging a proxy fight for control at the next annual meeting. In late 1976, MacClure and Podesta retained the law firm of Bell, Boyd, Lloyd, Haddad & Burns, and received advice concerning the various options available to them.

During early 1977, MacClure and Podesta discussed their concerns with various other shareholders including Francis Woolard, Robert Woolard and Howard Showalter; these three indicated that they would support a challenge to Fair's control. However, the defendants had not yet reached any agreement on whether to challenge Fair. In mid-January, MacClure met with Fair and other employees of Calumet, and was persuaded that the present management was adequate. Mr. MacClure's interest in challenging Fair was reactivated in February of 1977, when MacClure learned that he had been dropped from the management slate for board of directors.

The annual meeting was called for March 15, 1977. However, this meeting was promptly adjourned in order to permit management to correct certain disclosure deficiencies in the proxy material which had been pointed out by MacClure. During the delay, MacClure and Podesta obtained a shareholder list and made a count of shareholders they thought would support a challenge to Fair. They determined that no challenge could be successful without the support of the Bray shares, then under the control of Dr. Ulric Bray. Although Dr. Bray had occasionally expressed dissatisfaction with Fair, he informed Podesta that he would not support an attempt to oust Fair. In this situation, MacClure and Podesta recognized that a fight for control would fail, and declined nominations from the floor at the April 27, 1977, meeting. Management's slate was elected without opposition.

In May of 1977, Bell, Boyd, Lloyd, Haddad & Burns submitted a bill for services rendered; the fee was shared equally by MacClure, Podesta and Woolard & Co. A letter from Robert Podesta to the attorney notes:

> "I suppose that when and if we get in a position to challenge, and if we win, we might collect this expense from the company."

In August of 1977, Fair contracted with Amoco Chemicals Corp. for the sale of the Natchez petrochemical plant. In September, Fair attempted to repudiate the contract, and executed a second contract for its sale to a subsidiary of the Ethyl Corporation, at substantially the same price. During the same period, Fair attempted to settle the various royalty claims with the Bray Partnership claimed under licensing agreements between Calumet and the Partnership. No formal settlement was reached before Dr. Bray's death on November 20, 1977.

In September, 1977, the Board of Directors resolved to adopt five-year contracts with key employees, including directors Fair, Garey, Smith, Williams and Willard. Also at this meeting, Robert Willard, treasurer, was appointed to investigate various devices for an employees' stock ownership plan ("ESOP").

In October, 1977 the Ethyl Company sued Calumet for specific performance of the contract for the sale of the Natchez petro-

chemical plant in the Circuit Court of Cook County, Illinois. Amoco intervened as a defendant in that action, claiming that its contract was valid and that it, not Ethyl, was entitled to specific performance.

MacClure, Podesta and Francis Woolard attended hearings held in the state court, and again considered the possibility of mounting a proxy fight against the Fair management. On December 19, 1977, the state court ruled that Amoco's contract was valid and enforceable, and that Ethyl was entitled to specific performance of the contract for the sale of technology, but was not entitled to damages for fraud. In the course of his opinion, Judge Cohen soundly criticized Fair for his handling of the contract negotiations. Podesta sent copies of the state court's decision to nine persons, at least two of whom were shareholders of Calumet.

On December 28, 1977, Podesta met with Bannister Bray in California, and told him that he and Mr. MacClure were again considering a proxy fight. Bray did not indicate his and his family's position one way or the other. On January 3, 1978, MacClure called Bannister Bray at Podesta's suggestion, and Bray indicated that members of the Bray Group had been discussing the matter, and that it would be discussed at an upcoming meeting of the board of directors of the Bray Corporation.

On January 13, 1978, Fair met with Bannister Bray and Slaby. This meeting ended in angry disagreement. At the Bray Corporation directors' meeting on January 19, 1978, the board authorized Bannister Bray and Slaby to conduct further investigations regarding the possibility of supporting Podesta and MacClure in a proxy fight against the Fair management.

At this point, things began to move very quickly. On January 20, Podesta, MacClure, Francis Woolard and Robert Woolard began to compile a list of shareholders who might be willing to support the insurgents. On the advice of counsel, the Woolard firm stopped trading Calumet stock on January 23, 1978. On January 23, 1978, Podesta demanded a list of shareholders. When Fair refused this request, Podesta filed suit, and a Delaware court ordered production of the list.

During the last week of January, MacClure and Podesta discussed various individuals who might be willing to serve on the insurgents' slate of directors. They contacted several people in this regard, and most indicated that they would be willing to serve if it was decided that a proxy fight should be waged.

In addition, sometime during January, 1978, Podesta purchased 2,000 shares of Calumet stock. However, MacClure was unaware of this purchase.

During the final week of January, Slaby called Podesta and invited Podesta, MacClure and their attorney, John Bitner, to present proposals for the consideration of the Bray Group. Bitner prepared a draft voting agreement to be presented to the Bray Group. After meeting for several hours and making various changes in the draft, the agreement was signed on February 3, 1978. The primary signatories are Podesta, MacClure, Francis Woolard, and Bray Corporation, by Bannister Bray. The individual members of the Bray Group, Bannister Bray, Evelyn Bray and Eugene Slaby, representing 50,000 shares collectively, executed the agreement in their individual and representative capacities. The agreement provides that the parties agree to become members of a committee to be called the Stockholders' Protective Committee; that the primary purpose of this committee will be to elect a slate of directors to replace current management; that no party will dispose of any shares without first offering them to the primary signatories; that all parties will vote for the Committee's slate at the next annual meeting and not for the slate nominated by management; that Podesta and MacClure are granted irrevocable proxies to vote each party's shares at the next meeting; and that the Committee will solicit proxies from Calumet shareholders with respect to the election of directors. The agreement also notes that expenses, attorneys fees, and fees from a proxy solicitation firm will be shared equally by the primary signatories.

On February 13, 1978, the Committee members filed a Schedule 13D Statement with the SEC and all participants also filed statements of intention to participate in an election contest on Schedule 14Bs. These statements indicated that the participants intended to solicit proxies from Calumet shareholders. On February 23, 1978, the Committee submitted materials to the SEC which were designed to solicit *both* voting proxies and shareholder consents under Delaware Corporation Law § 228, 8 Del.Code 228. This section of the Delaware Code provides that action normally taken at a shareholders' meeting may be made without a meeting if, in this case, an absolute majority of the outstanding shares consent, in writing, to such action.

The SEC apparently informed the Committee that it should not attempt to solicit both proxies and consents at the same time. Accordingly, the Committee decided to concentrate on the solicitation of consents only. On March 2, 1978, Podesta executed a form indicating his consent to the election of the Committee's slate of directors. Under § 213, this event fixes the record date for those entitled to consent. On March 7, 1978, the Committee sent consent solicitation materials to shareholders. On March 13, 1978, an SEC staff member suggested that the Committee amend its 14B forms to indicate that consents were solicited. On March 15, 1978, the forms were amended to read "consent or proxy" rather than just "proxy". The Committee's counsel argued at the time that the amendment was unnecessary because the definition of "proxy" in the SEC rules specifically includes consents. The Committee claims that more than 50% of the shareholders' consents were received by March 23, 1978.

Meanwhile, management was also quite busy. In January and February of 1978, Calumet extended and purchased a set of long-outstanding stock purchase warrants for 18,500 shares of common stock which had been given in 1973 in connection with a loan from the First Pennsylvania Bank. Then, at the end of February, the warrants were sold to Mutual Petroleum Marketing Company, Inc., a customer and supplier of Calumet, which then exercised the warrants.

On February 14, 1978, the board of directors declared a $0.30 dividend, the first since 1969, which was announced on February 23, 1978.

On March 3, 1978, the board adopted an Employee Stock Ownership Plan ("ESOP") and a related Employee Stock Ownership Trust ("ESOT"). On March 9, the company contributed 10,097 shares of treasury stock to the ESOT, and loaned it enough money to purchase an additional 39,903 shares of authorized but previously unissued stock.

This action was filed by Calumet on March 17, 1978. On the same day, Podesta filed the related case, No. 78 C 1005, which seeks to invalidate the transfer of shares under the warrants and the ESOT transactions, and alleges waste, mismanagement, and violations in connection with the solicitation of proxies. The present action by Calumet seeks injunctive relief and damages for various alleged violations of the securities law.[1]

The plaintiff's motion for preliminary injunction was filed on March 17, 1978. During the pendency of the motion, the defendants have voluntarily agreed not to attempt to effectuate the consents, and the plaintiff has agreed not to take any action outside of the normal course of business. In addition to the solicitation of consents, the defendants have, since April 3, 1978, been soliciting proxies for the next annual meeting. Current management has been soliciting proxies and revocations of consents since March 31, 1978. The next annual meeting was originally scheduled for May 4, 1978, and has been continued to May 16, 1978.

The motion for preliminary injunction is based on various alleged violations of Sec-

---

1. Two weeks after the hearing on the motion for preliminary injunction, the plaintiff filed a motion for leave to file an amended complaint. Upon the representation of counsel that the new claims were based on evidence already before the court, leave was granted. These additional claims are discussed *infra* at pages 34–35.

tions 13(d), 14(a), and 14(d) of the Exchange Act.

### A. Standards for Preliminary Relief.

■ Both sides concede that the standards for preliminary relief are fairly clear; the plaintiff must establish:

(1) A probability of success on the merits;

(2) Irreparable injury for which there is no adequate remedy at law;

(3) The threatened injury to the plaintiff outweighs the harm which the injunction may cause the defendants; and

(4) The granting of a preliminary injunction will not disserve the public interest.

*Fox Valley Harvestor v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096 (7th Cir. 1976).

The parties have extensively argued the question of whether the plaintiff has met these standards. The alleged violations will be discussed separately.

### B. The Revocability of Consents.[2]

The consent forms sent to shareholders by the Committee include the following:

"This consent may not be revoked after the action it authorizes becomes effective, nor before the earlier of May 1, 1978 or the election of directors at a 1978 annual or special meeting of stockholders of the Company, if one is held."

The plaintiff argues that consents may not be made irrevocable under Delaware law, and therefore that this constitutes a material misrepresentation in violation of Section 14(a) of the Exchange Act.

Both sides agree that there is no Delaware statute or case law dealing with the revocability of § 228 consents. The courts have recognized the validity of the consent procedure as one means of electing directors, *Sundlun v. Executive Jet Aviation, Inc.*, 273 A.2d 282 (Del.1970), but the question of revocability apparently has not been resolved.

■ Accordingly, it is necessary for this court to determine the novel question whether the consents could be made irrevocable under Delaware law. The analysis must begin with the Delaware provision concerning the irrevocability of proxies:

"§ 212.(c) A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally."

This provision sets forth the traditional rule concerning revocability of proxies, based on the law of agency, *see Abercrombie v. Davies*, 35 Del.Ch. 599, 123 A.2d 893 (1956), *rev'd. on other grounds*, 36 Del.Ch. 371, 130 A.2d 338 (1957). The "interest" necessary in order to support irrevocability may be, for example, security for a loan, title to the stock itself, or, in more recent cases, an employee's interest in the corporation. There is no evidence that the defendants have an interest sufficient to support irrevocable proxies, *see In re Chilson*, 19 Del.Ch. 398, 168 A. 82 (1933).

■ The defendants have offered various reasons why consents should be subject to a different rule of revocability. First, they argue that the consents operate like voting agreements which are sanctioned by § 218 of the Delaware Code:

"§ 218.(c) An agreement between 2 or more stockholders, if in writing and signed by the parties thereto, may provide that in exercising any voting rights, the shares held by them shall be voted as provided by the agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon

---

**2.** The court has previously determined that the consents were revocable and that the statement of irrevocability in the solicitation material constituted a violation of Section 14(a)(9) of the Exchange Act, see Order dated April 25, 1978.

At that time the court ordered that notice be sent to the shareholders and stated that the reasons for this determination and order would be set forth in detail in a written opinion.

by them. No such agreement shall be effective for a term of more than 10 years, but, at any time within 2 years prior to the time of the expiration of such agreement, the parties may extend its duration for as many additional periods, each not to exceed 10 years, as they may desire."

However, the fundamental difference between the consent procedure and the voting agreement described in § 218 is that the voting agreement is a contract whereby the shareholders exchange promises, each in consideration of the other, *see Ringling Bros.–Barnum & Bailey Com. Shows v. Ringling*, 29 Del.Ch. 610, 53 A.2d 441, 447 (1947). The consents are given gratuitously, and thus are not part of an enforceable voting agreement.

The defendants next argue that unlike proxies, consents should not be viewed as agency authorizations, and thus should not be subject to the normal rule of revocability. The defendants contend that the signing of the consent is itself the significant event, and emphasize that under Delaware law, the consent of a majority of shareholders is essentially self-executing. In support of this theory, the defendants urge that at least limited irrevocability is an advantage inasmuch as it would avoid the uncertainty and additional administrative burden caused by permitting shareholders to revoke previously signed consents.

■ The defendants' theory is not persuasive. In view of the fact that the Delaware legislature has specifically provided that proxies may not generally be made irrevocable, the question before this court is whether there is sufficient basis for a distinction between proxies and consents for the purposes of determining revocability. Although there are important differences between these two devices, they are similar inasmuch as they provide a means whereby shareholders can exercise their votes without the necessity of actually attending a shareholders meeting. As a corollary, both are devices whereby competing sides may attempt to garner support for a particular policy or election among shareholders who normally may not become involved.

■ For the purposes of revocability, these similarities are more significant than the differences between proxies and consents. Inasmuch as the Delaware legislature has provided that the shareholder who votes by proxy normally has the right to revoke at any time prior to when the vote is taken, the shareholder who votes by consent should also be entitled to reconsider and revoke his consent at any time prior to when the action authorized becomes effective.

■ Accordingly, it is the court's judgment that § 228 consents are revocable under Delaware law until such time as the action they authorize becomes effective, when an absolute majority of the outstanding shares have consented.

■ The defendants argue that even if the consents were revocable, the misstatement concerning revocability cannot be a violation of Section 14(a) because it involved a disputed issue of law. The defendants cite *Ash v. LFE Corporation*, 525 F.2d 215 (3d Cir. 1975); *Shapiro v. Belmont Industries, Inc.*, 438 F.Supp. 284 (E.D.Pa. 1977); and *Voege v. The Magnavox Co.*, 439 F.Supp. 935 [Current Binder] (D.Del.1977), for the proposition that the Proxy Rules do not require disclosure of controversial legal issues. However, those cases all involved solicitation material which simply omitted alternative claims concerning the validity of certain corporate activity. In both *Ash* and *Voege*, the court expressly found that the conflicting claims had not been brought to the attention of the corporation. In contrast, the misstatement in this case concerned the very nature of the consent procedure itself. This misstatement might have confused shareholders as to their voting rights. In such a case, the fact that the issue turned on a disputed question of law cannot provide an absolute defense.

■ There is no evidence that the defendants acted in bad faith in attempting to make the consents irrevocable. In the absence of any Delaware statute or case law, they were required to hazard a judgment at

what a court would eventually decide, and there can be no culpability for an incorrect guess.

■ Nevertheless, the defendants' misstatement must be considered as a violation of Section 14(a)(9). As explained by the court in *Ash v. LFE Corporation*, 525 F.2d 215 (3d Cir. 1975), the defendants' good faith is not determinative in a case such as this:

> "We point out that unlike *Gerstle · v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1298–1301 (2d Cir. 1973), which deals with a damage remedy implied from § 14(a), we are in this case concerned only with injunctive relief directed to the integrity of the exercise of stockholder franchise. Whatever may be the rule with respect to scienter when other remedies such as damages or recission of a sale are sought, we have no hesitancy in recognizing that for prospective relief looking to the protection of the franchise the test for the purposes of Rule 14a–9 is the objective sufficiency of the disclosure." 525 F.2d at 220.

Moreover, it is clear that information concerning revocability is material; Rule 14a–101, 17 C.F.R. § 240.14a–101, provides that a proxy statement must state whether or not the person giving the proxy has the power to revoke it. This information would doubtlessly influence the decision to consent and the subsequent decision not to revoke, *see TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

■ The corporation has standing to complain of this violation, *General Time Corp. v. Talley Industries, Inc.*, 403 F.2d 159 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969). In view of the defendants' claim that they have now received consents from at least 53% of the outstanding shares, the court finds that irreparable injury, a change in the board of directors which may result in transactions which would be difficult to unscramble, is likely to occur if preliminary relief is not granted. The balance of equities, and the public interest, support the plaintiff's request for preliminary relief.

Finally, the defendants argue that the plaintiff is barred from relief because current management has engaged in improper conduct in connection with the issuance of shares in the ESOP and stock purchase warrant transactions. These allegations are the same as those which form the basis of the related case of *Podesta v. Calumet Industries*, No. 78 C 1005, now pending before this court. However, the defendants' attempt to combine the two cases through application of the doctrine of unclean hands is misguided. The allegations against the plaintiff are separate from the transaction underlying this litigation.

■ Accordingly, the court has concluded that some form of preliminary relief is warranted in order to correct the effects of the defendants' innocent, yet mistaken, representation that the consents are irrevocable. The court is not bound to grant the precise form of relief requested by the plaintiff. In remedying the effects of proxy rule violations, courts may fashion equitable relief suited to the special circumstances of the case, *Mills v. Electric Auto-Lite*, 396 U.S. 375, 386, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). In this case, the defendants' misrepresentation would lead a shareholder to believe that he was being asked to give an irrevocable consent, and that once signed, he could not revoke the consent. This misrepresentation could not have caused any shareholder to consent if he would not have otherwise (in fact it may have deterred some from consenting); however, it may have inhibited some consenters who would have revoked their consents.

■ Accordingly, as was indicated by the order of April 25, 1978, the court has determined that an appropriate form of relief is to enjoin the exercise of all consents received by the defendants for a period during which shareholders may revoke their consents. In view of the fact that shareholders have already had considerable time in which to reconsider their consents, and that management has actively solicited revocations since March 31, 1978, a relatively

short period will be sufficient. After receiving suggestions from the parties, the court has set May 16, at 2:00 P.M., Central Daylight Savings Time, as the end point for the revocation period. Notice to this effect has already been sent to all shareholders of record as of March 2, 1978.[3] (See order dated April 25, 1978.) On May 16, 1978, all unrevoked consents will be counted; thereafter, on this same date, proxies will also be counted. A representative of the court will attend the countings as an observer.

### C. The Alleged 14(d) Violation.

The plaintiff has alleged that the defendants engaged in a "tender offer" and therefore were required to make disclosures in accordance with Section 14(d) of the Exchange Act, 15 U.S.C. § 78n(d), and the regulations issued thereunder, Regulation 14D, 17 C.F.R. § 240.14d–1 *et seq.* As a factual basis for this allegation, the plaintiff points to evidence that MacClure looked into a purchase of stock held by the Bray Partnership in January of 1977; that Podesta purchased 2,000 shares of Calumet stock in January of 1978; and that the retail sales of Calumet stock by the Woolard & Co. firm increased in January, 1978. The plaintiff argues that these occurrences, together with the Bray agreement of February 3, 1978, constituted a "creeping tender offer" within the meaning of Section 14(d).

However, courts have repeatedly held that the requirements of that section are not triggered by regular purchases in the open market, *see, e. g., Copperweld Corp. v. Imetal*, 403 F.Supp. 579 (W.D.Pa.1975); *CLC of America v. Scheuer*, No. 78 C 273 (N.D.Ill. March 24, 1978). The minimal open market purchases revealed in this case simply could not support a finding of a tender offer.

Accordingly, the plaintiff has failed to establish a probability of success on the merits of the 14(d) allegation.

### D. The Allegation That Schedule 13D Was Untimely Filed.

The plaintiff contends that the defendants violated Section 13(d) by failing to file any Schedule 13D in 1976 or in 1977. It is the plaintiff's theory that the disclosure requirements of Section 13(d) are triggered when a "group" is formed, and that a "group" is formed when persons owning an aggregate in excess of 5% of the outstanding shares agree to act together to assume control of a corporation. The plaintiff notes that MacClure and Podesta together hold well over 5% of the outstanding shares of Calumet, and argues that a Section 13(d) "group" was formed by them as early as December of 1976, but at least by December, 1977.

Section 13(d), in relevant parts, provides as follows:

"(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered . . ., is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, . . . send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information . . . .

. . . . .

"(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."

Rule 13(d)(6), 7 C.F.R. 240.13d–6 provides:

"(b) When two or more persons agree, orally or in writing, to act together for the purpose of acquiring, holding or disposing of securities of an issuer, the group formed thereby shall be deemed to

---

**3.** March 2, 1978, was the date when the first consent was signed by Podesta. This event fixes the record date under § 213 of the Delaware Code.

have acquired, as of the date of such agreement, beneficial ownership of all securities of that issuer beneficially owned by any such persons, for purposes of section 13(d)(1)."

In cases interpreting section 13(d), the Circuits have reached conflicting conclusions as to when disclosure by a group is required, *compare Bath Industries v. Blot*, 427 F.2d 97 (7th Cir. 1970), with *GAF v. Milstein*, 453 F.2d 709 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), and *Walter & Wall Associates, Inc. v. American Consumer Industries;* CCH Fed.Sec.L.Rptr. ¶ 93,943 (D.N.J. 1973). In *Bath*, the Seventh Circuit held that "the Act should be interpreted to require compliance with its disclosure provisions when, but only when, any group of stockholders owning more than 10% [now 5%] of the outstanding shares of the corporation agree to act in concert *to acquire additional shares*." (Emphasis in original.) 427 F.2d at 109. The court based this holding on the legislative history which indicates that Congress was most concerned with protecting individual investors, and in fact took great care to avoid any shift in the balance of power between management and insurgent shareholder groups. Accordingly, the Seventh Circuit decided that Section 13(d) did not apply to a mere agreement to seek control:

"It does not proscribe informal discussion among existing shareholders concerning the performance of current management. Nor does it proscribe legitimate cooperation among existing shareholders to assert their determination to take over control of management, *absent* an intention to acquire additional shares for the furtherance of such purpose." (Emphasis in original.) 427 F.2d at 110.

The Second Circuit declined to follow *Bath*, and has adopted the rule that Section 13(d) is triggered by a mere agreement to act in concert to gain control by the owners of more than 5% even without any additional agreement to acquire shares. The Second Circuit determined that this rule was necessary in order to achieve the purpose of alerting the marketplace to *any* accumulation of securities which may affect corporate control. This position has been criticized as giving incumbent management an unwarranted edge over insurgent shareholder groups.[4]

This court is, of course, bound to follow *Bath*.[5] Accordingly, in this case success on the merits of the plaintiff's allegation that the defendants should have filed Schedule 13D forms in 1976 or 1977 will depend on a showing that they agreed not only to attempt to gain control of Calumet, but also to acquire shares in furtherance of that end.[6] The *Bath* court indicated that once an agreement to gain control has been shown, evidence that any member of the group thereafter purchased additional stock could give rise to a rebuttable presumption that the group had agreed to acquire additional shares, 427 F.2d at 110.

However, in this case the plaintiff has failed to show a probability of success on this claim. First, as discussed above, the plaintiff has failed to show that the defendants in fact agreed to attempt to gain control of Calumet in 1976 or 1977. Moreover, contrary to the plaintiff's theory, the additional requirement of an agreement to acquire, hold or dispose of shares cannot be satisfied by an agreement to solicit proxies. The plaintiff has argued that solicitation of a proxy should be considered as the acquisition of a security under Section 13(d). Although *Bath* did hold that invest-

---

4. *See, e. g.,* Young, Section 13(d)—"A New Element in the Battles for Control of Corporate Management", 27 Bus.L. 1137 (July, 1972).

5. The plaintiff has argued that *Bath* is no longer good law in view of a new rule 13(d)(6)(b) which incorporates the *GAF* position, *see* Exchange Act Release No. 13291 (February 1977), CCH Fed.Sec.L.Rep. ¶ 80,980. However, this regulation did not become effective until April

5, 1978, and is relevant here only as evidence of the SEC's opinion.

6. Under the language of Section 13(d)(3), this requirement could also be met by proof of an agreement to hold or to dispose of shares in furtherance of a common goal of gaining control, *see* footnote 8, *infra.*

ment and banking firms which exercised continuous control over the votes of their clients' shares enjoyed "beneficial ownership", 427 F.2d at 103, that holding does not extend to the possession of a revocable proxy to vote at a single meeting. To extend *Bath* that far would be to undermine the court's holding that a mere agreement to gain control is not sufficient to trigger the disclosure requirements.

Moreover, the evidence indicates that the defendants did not even agree to wage a proxy solicitation prior to being assured that the Bray Group would support them. It was evident to all involved that no challenge would succeed without the support of this large block of votes, and the activities of Podesta, MacClure and Woolard indicate that any discussions carried on prior to obtaining that support were preliminary in nature and did not amount to an agreement within the meaning of Section 13(d).

Similarly, the plaintiff cannot claim a probability of success merely because Podesta purchased 2,000 shares of Calumet stock in January of 1978. Under *Bath,* a rebuttable presumption of an agreement to acquire more shares would be raised if the plaintiff had shown that a group had previously agreed to pursue a common goal of obtaining corporate control.[7] The court's finding is that the plaintiff has not shown that it will be able to prove that an agreement to gain control existed. However, even if the plaintiff could make such a showing, the evidence is sufficient to overcome any presumption raised by the Podesta purchase. This purchase was made in the regular course of Podesta's business,

and MacClure did not even know about it. There is no indication that the defendants place any significance at all on the purchase.

Accordingly, the plaintiff has failed to make a sufficient showing that the defendants agreed to acquire, hold, or dispose of shares prior to the February 3, 1978, agreement among Podesta, MacClure, Woolard, and the Bray Group.[8] On this basis, the plaintiff has failed to show a probability of success on the claim that the Schedule 13D was untimely.

E. *The Allegation of Misrepresentations in the Schedule 13D and 14Bs.*

 As noted above the. defendants' 13D and 14B forms originally indicated that they intended to solicit proxies. The 13D form makes this suggestion in paraphrasing the February 3rd agreement, and the 14Bs state the participants' intention to engage in soliciting proxies. By amendment on March 15, 1978, these forms were amended to read "consent or proxy". The plaintiff contends that the original filings constituted misrepresentation and thus violated SEC Rules 13(d)(2), 14(a)(9), and 14(a)(11).

However, this allegation cannot support the plaintiff's claim for injunctive relief for several reasons. First, it is unlikely that the plaintiff will succeed on the merits of this claim. As to the Schedule 13D, the defendants' representation was merely as to what was in the February 3rd agreement, and they were not even required to include plans to change the board of management, *see Nachman Corp. v. Halfred, Inc.,* CCH Fed.Sec.L.Rep. ¶ 94,455 (N.D.Ill.1973).[9]

---

7. The defendants argue that this purchase should be disregarded because Section 13(d)(6)(B) exempts any acquisition which, together with all other acquisitions by the same person during the preceding twelve months, does not exceed 2 per centum of that class of shares. However, in this case, the Podesta purchase is significant not as an independent triggering event, but rather as circumstantial evidence to show the existence of a prior agreement to acquire additional shares. Section 13(d)(6)(B) is not applicable to this analysis.

8. As the defendants point out, there could be some question whether the February 3rd agree-

ment itself triggered the requirement of filing a Schedule 13D. As discussed in the text, a mere agreement to solicit proxies would not trigger disclosure under *Bath.* However, the February 3rd agreement does include mutual promises not to dispose of any shares without first offering them to the primary signatories. This is an agreement directed towards the holding and disposing of shares.

9. *Cf.* Exchange Act Release No. 13292 (February, 1977) CCH Fed.Sec.L.Rep. ¶ 80,981 (proposed change in item 4 of Schedule 13D to require disclosure of plans to change board of directors or management).

Moreover, the SEC regulations define the term "proxy" to include "every proxy, *consent* or authorization" (emphasis added), 17 C.F.R. § 240.14a–1(d).

Finally, the plaintiff has failed to show that it would suffer irreparable injury flowing from these alleged violations. Current management was alerted to the existence of the Stockholders' Protective Committee by the February 3rd filings, and they were aware of shareholder dissatisfaction even before that. The possibility of a proxy fight was acknowledged by everyone, and the alternative of shareholder action by consent was equally predictable in view of Delaware's § 228.

F. *The Allegation of Pre-filing Solicitation in Violation of Section 14(a) and Rule 14a–3.*

 The plaintiff has charged that the defendants engaged in pre-filing solicitation of more than 10 people in violation of Section 14(a) and Rule 14a–3.[10] In support of this claim, the plaintiff points out that five of the signers of the February 3rd agreement must have been solicited by the sixth or each other; that an additional five shareholders who are listed as "supporters" in the defendants' consent solicitation material must have been solicited; and that at least two other shareholders (Bonniwill and Sutter) were solicited by Podesta when he sent them copies of Judge Cohen's decision in the Natchez plant litigation. The plaintiff's theory is based on the argument that "solicitation" should be broadly interpreted to cover any communication which may eventually influence the giving of proxies when they are actually requested.

However, this broad definition is not warranted. The plaintiff's citation of *SEC v. Okin,* 132 F.2d 784 (2d Cir. 1943), does not compel such an interpretation. In that case the defendant sent shareholders a letter asking them not to sign any proxies for the company, and to revoke any already signed. The court found that in view of the com-

plaint's allegation that this letter was the first step in the defendant's plan to solicit his own proxies, it could be seen as part of a continuous plan, and that the Commission's power over the regulation of proxies could extend to such communications.

The present regulations provide a clear definition of solicitation:

"(f) *Solicitation.* (1) The terms 'solicit' and 'solicitation' include:

"(i) Any request for a proxy whether or not accompanied by or included in a form of proxy;

"(ii) Any request to execute or not to execute, or to revoke, a proxy; or

"(iii) The furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a–1(f).

 The evidence does not support the plaintiff's claim that the organizational communications which went on among members of the Committee and its supporters constituted proxy solicitation. Moreover, the plaintiff has failed to show irreparable injury which flowed from this alleged violation. This conduct cannot be a basis for issuance of a preliminary injunction.

G. *Allegations of False and Misleading Statements in the Defendants' Consent Solicitation Materials in Violation of Section 14(a).*

In addition to the matter regarding the irrevocability of consents, the plaintiff has charged that the solicitation material sent by the defendants contained false and misleading information. The plaintiff has isolated three areas which are allegedly false and misleading.

(1) *Disclosures Concerning the Bray Group and the Bray Corporation.*

 The solicitation material includes a statement concerning the Bray Group and

10. Rule 14a–2, 17 C.F.R. § 240.14a–2(a) exempts solicitations of not more than ten persons.

the Bray Corporation which reviews the past business relationship between Calumet and the Bray businesses. This statement also sets forth the amount of the claims now asserted by the Bray Corporation against Calumet on account of the petrochemical venture, and recites the amount of the Ridge-Wheel notes which the Bray Group contends are owed by Calumet. The statement concludes that the Committee nominees, if elected, intend to pursue negotiations directed toward good faith settlement of the petrochemical claims and to examine the circumstances surrounding the Ridge-Wheel notes.

The plaintiff argues that this statement is materially misleading because it does not include certain matters which the plaintiff contends are material. However, the plaintiff has failed to show a probability of success on this claim. Many of the alleged omissions are simply not material, such as the fact that Podesta and MacClure expressed doubt over Calumet's liability in August of 1975. Other matters are, in fact, included or implied by the statement, such as that Calumet has asserted defenses to the Bray Corporation claims. Finally, the plaintiff has failed to offer evidence sufficient to support the other allegations, such as that the insurgents had agreed to a favorable settlement in exchange for the support of the Bray Group, or that the Bray Corporation claims much more than the $303,400. figure mentioned.[11]

### (2) Dividends.

The solicitation material includes the following statement concerning the dividend declared on February 14, 1978:

"On February 23, 1978, the Company announced that its board of directors had declared a dividend of 30¢ per share, *the Company's first since 1969.* We welcome this payment—it is long overdue. However, Fair knew of our Committee by that time. Do you think there's any connection?"

The plaintiff contends that this statement is false and misleading because the Company was previously prevented from paying dividends under the terms of a loan agreement. In addition, the plaintiff claims that Fair did not know of the existence of the Committee until after the dividend was declared.

However, the plaintiff has failed to show a probability of success on these objections. First, the existence of loan agreement restrictions is not material to the statement's implication that the Company should have paid dividends earlier—there is no evidence that Calumet could not have terminated the restrictions by paying off the loans just as it did on February 10, 1978. Second, although the evidence is conflicting as to when Fair actually saw the Committee's 13D filing, there is evidence that it was delivered to his office on February 13, 1978, the day before the dividend was declared. Moreover, the evidence is clear that Fair knew of preliminary activity by the insurgents as early as January 23, 1978, when Podesta requested a shareholders list.

Accordingly, the court finds that the statement concerning dividends does not constitute a material misrepresentation.

### (3) Statements Concerning the Calumet-Ethyl Case.

The defendants' solicitation material refers to the sale of the Natchez petrochemical plant. It characterizes Fair's conduct as "double-dealing", quotes from Judge Cohen's decision criticizing Fair, and states that Fair caused Calumet to become involved in "costly litigation". The plaintiff objects to these representations essentially because they do not set forth Fair's side of the story, because the litigation cost only $15,300., and because the "double-dealing" term is too harsh.

The plaintiff's objections are not sufficient to demonstrate a probability that these statements will be found materially

11. Although Mr. Slaby stated that the royalty claims were for over a million dollars, the Bray Corporation agreed to and approved the statement in the solicitation materials that only $303,400. was claimed.

misleading. Although arguably exaggerated, the "double-dealing" and "costly" characterizations are not so misleading as to constitute violations of Section 14(a). Similarly, the defendants were not required to set forth Fair's side of the story, particularly when this had been implicitly rejected by the state court judge who presided over the Calumet-Ethyl litigation.

### H. *Allegations Made in the Amended Complaint Concerning Statements in the Proxy Solicitation Materials of April 3, 1978.*

█ As noted above, both sides have been soliciting proxies during the pendency of this motion. Two weeks after the hearing, the plaintiff tendered an amended complaint. The amended complaint makes explicit the plaintiff's claim that any misrepresentation or other violation which tainted the consent solicitation would also taint the defendants' proxy solicitations. This allegation was implicit in the original complaint, and has been considered by the court. In addition, the amended complaint contains allegations that the proxy solicitations contain new misrepresentations; upon the representation of counsel that the claims were based on evidence already before the court, leave to file the amended complaint was granted.

The court has now reviewed these additional claims and none of them warrants preliminary relief beyond that indicated above.

### (1) *The Statements Concerning Fair's Involvement with Ridge-Wheel.*

The defendants' proxy solicitations state that Harry Fair owns 75% of H & A Enterprises, which in turn owns the minority interest of 16⅔% of Ridge-Wheel (Calumet owns 83⅓%). The statement notes that Fair did not disclose this personal involvement until the revised 1977 proxy statement.

The plaintiff alleges that this statement is misleading because it does not disclose that in 1972 Calumet was given a permanent option to purchase Fair's interest in Ridge-Wheel. The plaintiff contends that the existence of this option insures that any profit will go to Calumet, while Fair will assume any loss. Regardless of the theoretical and actual effects of the 1972 option, the proxy solicitation statement is not misleading for its failure to discuss the option. The import of the statement is that Harry Fair was personally involved with Ridge-Wheel. The plaintiff does not dispute that this is true, and the existence of the option does not affect that fact.

Accordingly, the plaintiff has failed to show a probability of success of the merits of this claim.

### (2) *The Statements Concerning the Failure of the Ridge-Wheel Venture.*

The proxy solicitation material refers to the Ridge-Wheel venture as "disastrous". The plaintiff contends that this is misleading in the absence of information that MacClure and Podesta did not object to the venture in their 1975 report to the board of directors, and that Podesta said in March of 1978 that he would like to own the property.

These omissions do not render the disclosure misleading. Accordingly, the plaintiff has not shown a probability of success on the merits of this claim.

### (3) *Statements Concerning the Sale of the Petrochemical Plant.*

The proxy solicitation material states that Fair refused to follow the advice of various outside directors to sell the plant. The plaintiff contends that this statement is misleading in the absence of information that Fair has made various attempts to sell the plant and that one recommendation to sell arose from a study which Fair himself requested.

Again, these omissions simply do not render the statement misleading. The plaintiff has not shown a probability of success on the merits of this claim.

In conclusion, the court finds that the plaintiff is entitled to preliminary relief only on the limited issue of the irrevocability of the consents.

Accordingly, the defendants are hereby enjoined from exercising any consents heretofore received until the May 16, 1978, counting is reviewed and approved by the court. The plaintiff's motion for preliminary injunction is in all other respects denied.